[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
05/25/99
THOMAS  K. KAHN
CLERK

————————————

Nos. 98-8257 & 98-8418

————————————

N.L.R.B. Nos. 10-CA-25736, et al.

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

DYNATRON/BONDO CORPORATION,

Respondent.

————————————

Applications for Enforcement of Orders of the
National Labor Relations Board (Georgia Case)

————————————

**(May 25, 1999)**

Before COX, BIRCH and HULL, Circuit Judges.

PER CURIAM:

The National Labor Relations Board seeks to enforce two decisions and orders against Dynatron/Bondo Corporation. Dynatron, for its part, challenges those orders. We enforce in part and deny enforcement in part.

## I. Background

In yet another chapter in a long battle between Dynatron and its employees, the newly certified Union of Needletrades Industrial and Textile Employees accused Dynatron of engaging in several unfair labor practices. The practices still at issue[1] here fall into two categories: impermissible unilateral changes to working conditions, *see* 29 U.S.C. § 158(a)(5); *Litton Financial Printing Div. v. N.L.R.B.*, 501 U.S. 190, 198, 111 S. Ct. 2215, 2221 (1991), and discrimination against pro-union employees, *see* 29 U.S.C. § 158(a)(3).

The unilateral changes charged (and still at issue here) were: (1) ceasing of regular merit raises; (2) raising employee contributions to group health insurance premiums; (3) banning smoking in Dynatron's entire plant; (4) establishing a rule requiring an employee to timely arrive at his work station, in addition to punching in on time; (5) assigning employees numbered parking spaces; (6) requiring employees to use and carry ID cards; (7) promulgating new disciplinary rules for material handlers; and (8) fixing compensation for plant shutdowns due to hurricanes. The two alleged discharges in violation of NLRA § 8(a)(3) were of Floyd Robin Davis, ostensibly fired for taking four green pens to use in his work without authorization, and Lee Carter, assertedly fired for using abusive and profane language to a member of management and for insubordination.

---

[1] The original charges included some other alleged unfair labor practices (such as Dynatron's unilateral elimination of "safety bingo"), but no one challenges the result below on those practices.

2

The administrative law judge ruled against Dynatron in every respect in the complaints based on these charges. He found that Dynatron, by unilaterally altering the working conditions described above, had refused to bargain in good faith. He further found that Davis and Carter had been fired for their vocal support of the union. Dynatron appealed to the N.L.R.B., which substantially agreed with the ALJ and ordered appropriate relief. Dynatron now seeks to have this court deny enforcement of the N.LR.B.'s orders.[2]

Dynatron has not argued that the Board's rules are unreasonable in any respect. Rather, some of its challenges rest on the assertion that the record before the Board does not support the Board's findings of fact. These findings are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e), (f). "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 118 S. Ct. 818, 823 (1998). Other challenges rest on the Board's application of N.L.R.B. rules to the facts. As in the case of construction of the Act, we defer to the Board's application of its rules if the application is reasonable. *See Evans Servs., Inc. v. N.L.R.B.*, 810 F.2d 1089, 1092 (11th Cir. 1987).

## II. Discussion

1. *Merit increases.*

---

[2] The N.L.R.B. asks this court to enforce those portions of its orders that Dynatron has not challenged, particularly those relating to the Board's finding that Dynatron engaged in improper surveillance of union leafleting and fired employees Pepper, Bennett, and Moss in retaliation for union activity. The N.L.R.B. is of course due enforcement of the parts of its orders relating to these findings, and we summarily enforce them. *See* 29 U.S.C. § 160(e), (f); *Northport Health Servs., Inc. v. N.L.R.B.*, 961 F.2d 1547, 1551 n.3 (11th Cir. 1992).

The Board concluded that Dynatron had engaged in an unfair labor practice under 29 U.S.C. § 158(a)(5) by unilaterally ceasing to grant merit pay increases after May 1993. Dynatron does not dispute that discontinuing merit pay increases would be an unfair labor practice, nor does it dispute that it discontinued the increases. Dynatron argues, rather, that as a matter of fact regular merit pay increases were never a condition of employment, since even before May 1993 such increases were awarded only at Dynatron's whim. Dynatron's argument on this point rests on the testimony of its management and on profiles of a few employees' wage history.

While one certainly could reasonably agree with Dynatron, we conclude that the Board's finding of a past policy is based on substantial evidence. It was undisputed that employees underwent merit reviews during the relevant period. The coversheet of performance reviews prescribed a three-step process. The second step was to "DECIDE ON RECOMMENDED INCREASE, IF ANY." (*E.g.*, 98-8257 R.2-Gen'l Counsel Ex. 140 at 1.) The third step was to "REVIEW PROPOSED EVALUATION AND INCREASE WITH PERSONNEL MANAGER." (*E.g.*, *id.*) According to a summary of merit pay increases from the late 1980s through 1993 (whose accuracy is not controverted), a majority of employees received annual merit pay increases in each year. Over the period summarized, almost all employees hired before 1992 received at least one merit pay increase on a service anniversary. All this evidence suggests that Dynatron did have a practice of frequently awarding merit increases on anniversary dates, and it distinguishes this case from those in which the practice of awarding merit pay increases was totally capricious and not based on periodic evaluation. *See, e.g.*, *Ithaca Journal-News, Inc.*, 259 N.L.R.B. 394, 395 (1981).

The Board was entitled, moreover, to give little weight to the testimony of Dynatron management. The plant manager's testimony, for instance, was inconsistent with his own testimony

4

and the human resources manager's: when first asked of the merit review and pay raise process, the plant manager testified that "[g]enerally there was a three[-]month review, a six[-]month review, and an annual review. Basically, we give an increase really at any one of those times or any combination of those times." (98-8257 Tr. at 342.) Later, however, he testified that "[p]eople received increases indiscriminately at anytime [*sic*]." (*Id.* at 344.) And the human resources manager testified that raises were given "haphazardly" and were "all over the place." (*Id.* at 429-30.) The cherry-picked examples of six employees whose merit pay increases did not follow the policy, moreover, are only weakly persuasive for the usual reasons that cherry-picked examples are not; exceptions may disprove a firm rule, but they do not undermine evidence of a broad and general policy.

Considering the record "as a whole," 29 U.S.C. § 160(e), (f), we conclude that substantial evidence supported the Board's finding, and we enforce the portion of its order concerning the merit pay increases.

### 2. *Health Insurance Premiums*.

The Board ruled that Dynatron engaged in an unfair labor practice in violation of 29 U.S.C. § 158(a)(5) by unilaterally increasing employee contributions to health insurance premiums following a unilateral decision to select a more expensive insurance carrier. Dynatron does not dispute that if it had no fixed policy of passing on premium costs, increasing the employee contribution would have to be negotiated with the union. *See N.L.R.B. v. Allis-Chalmers Corp.*, 601 F.2d 870, 875-76 (5th Cir. 1979). Rather, Dynatron argues that it had a fixed policy.

Substantial evidence supports the Board's conclusion to the contrary. No one disputes that Dynatron made two revisions to the employee contribution before union certification: Dynatron lowered the employee contribution once (from 18% to 13% for individuals) and raised it once (from

5

13% to 15%).  Against this evidence of apparently random fluctuation, Dynatron offered no evidence (at least that it points to in its brief) that these changes resulted from anything but pure whim.  We therefore accept the Board's finding that Dynatron had no policy concerning employee contributions before 1991 and enforce the pertinent parts of the Board's order.

3.     *Smoking Policy.*

The Board found that Dynatron had unilaterally banned smoking on its premises without negotiation, in violation of 29 U.S.C. § 158(a)(5).  Dynatron's first argument is that it sought to negotiate, but the union refused to negotiate in good faith.  This argument may have merit; certainly the union representative's breathtaking rudeness at the July 27, 1993 bargaining session over smoking policy could persuade a casual reader that the union bargained in bad faith.[3]  But we cannot tell that Dynatron made this argument before the Board.  Dynatron's memorandum to the Board is not included in the record, and Dynatron excepted only to "the ALJ's conclusion that Respondent violated the Act when it implemented a ban on smoking . . . ; on the grounds that such conclusion is unsupported by the evidence in the record and contrary to law."  (98-8257 R.4 at 615 ¶ 25.)  The Board represents that the argument in support of this objection did not include an assertion that the union bargained in bad faith.  Dynatron does not deny this representation, and we therefore conclude that we lack jurisdiction to consider Dynatron's argument.  *See Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 665-66, 102 S. Ct. 2071, 2083 (1982).

---

[3]     Among other things, Harris Raynor, the union representative, complained to the company's counsel on unrelated matters, refused not to smoke during the session, continually engaged in ad hominem attacks on the company's counsel, repeatedly threatened legal action, and changed the subject away from smoking policy.

Dynatron's remaining contention is that the risk of a fire or explosion justified its unilateral ban of smoking on its premises. The Board does not deny that an emergency safety threat would excuse unilateral action, *see Smith Co. of Calif., Inc.*, 200 N.L.R.B. 772, 780 (1972), but it argues that the Board's finding that no emergency exists rests on substantial evidence. We agree. While Dynatron offered evidence that certain volatile chemicals are trucked into the plant past the former smoking area, and that these trucks sometimes leak, there was no evidence that Dynatron or any similar manufacturer has ever had a problem or taken any corrective action until 1993. This lack of an antismoking policy or a history of fires may not justify a finding that there is no risk, but it is substantial enough evidence to support the Board's finding that smoking in the areas where the employees were permitted to smoke before 1993 did not create an emergency. In any event, the Board has tailored its order to permit Dynatron to ban smoking wherever it can show that smoking would be a hazard.

Because the Board's finding is supported by substantial evidence, we enforce the portion of its order relating to the smoking ban.

### 4. *New Tardiness Rule and Discharge of Lamar Shelton*.

The Board concluded that the company had unilaterally created a new rule, which resulted in Lamar Shelton's discharge, that arriving less than 15 minutes late to one's work station is a disciplinary infraction distinct from the existing infraction of arriving more than 15 minutes late to work. Dynatron has not contested these findings. Rather, the company argues that the union was on notice of the new rule more than six months before it filed a charge of unfair labor practices, and that the charge was thus untimely under 29 U.S.C. § 160(b). The Board rejected this argument. It concluded that the union could not have known that a new work rule was in effect until Lamar

7

Shelton was fired because the company denied that a new work rule had been put into effect. Alternatively, the Board held that other, timely charges adequately encompassed this charge. The Board's application of the 10(b) period of limitations to this evidence is unreasonable, as is its conclusion that the other charges encompassed this one.

In the spring of 1994, the company began issuing "disciplinary actions" to employees for "late arrival to work area." (98-8418 R.2-Resp't's Ex. 5 at 2-42.) As many as twelve of these were issued before September 19, 1994; one of the disciplined employees was Lamar Shelton, who received two such notices. These disciplinary actions were produced to the union, and in a meeting on September 19, 1994, the union representative broached the issue:

> HR [Harris Raynor, Union Representative]: . . . Okay. Second thing I would like to know is has the company instituted any new disciplinary measures? Specifically, a number of warnings have been received lately for lateness that I haven't received before.

> WL [Walter Lambeth, Dynatron's counsel]: Maybe they haven't been late before.

> HR: These notices are not simply for lateness — specifically reporting late to their work station. My assumption is the company means its employees punched in on time but were not at the appropriate work space on time. It's impossible to tell if it happened during the day or if it is just in the AM.

> WL: If you will ask about specific employees, . . .

> HR: When someone was tardy before, the notice listed the dates they were late and whatever level of discipline they were at. These notices use terminology I've never seen before on any other warning.

> WL: There has been no change in company Disciplinary Policy, I can tell you that. If you are late coming to work or late arriving at your work station, that is simply late. It is a violation of company rules.

> HR: You so stated without any discussion with the committee members on your company committee?

> WL: We have discussed this.

HR:  When have you discussed it?

WL: None of your business.  I have discussed this with my client numerous times —
the subject of employees arriving late for work.

HR: Where in the handbook is it that this is an offense seeing as how you have
discussed this.  I brought some of the warnings with me — late arrival in work
station: John Riggins, Catherine Graddy, John Usher, Chris Sherman, Gene Bennett,
Lamar Shelton, Sonza Burley — all occurred in August.  Was no one late prior to
August 15th?  Are you creating a new policy?

WL: Maybe they never came late before.  I don't know.  Occasionally that happens.
I'm just looking through the book.  I am not total [*sic*] conversant with the company
rules.  Page 26, #7 has to do with tardiness.

HR: We consider this to be a new work rule.

ER [Earnestine Riggins]: There are temps walking through all the time.

WL: We haven't created any new work rules.

HR: Okay.

(98-8418 R.2-Gen'l Counsel's Ex. 50 at 2-3.)  Following this meeting, the company continued to

issue disciplinary actions for late arrival to work area or work station.  These precipitated a second

broaching of the subject on September 11, 1995:

HR: . . . [I]s attendance separate from or part of the other discipline procedures.

WL: It is a separate program for most purposes.  You have to get four attendance
violations over the allowed time.  That is a rolling date.  You can concurrently have
some other offences under the regular disciplinary rules of conduct and as long as
you didn't hit the stated last offense, you would not be discharged.  We do not
combine these.  What you may be referring to is if you do not get to your work
station and report to work in a timely manner at start or after break.  You are tardy
under attendance policy if you are 15 minutes or more late punching in.  Under the
disciplinary policy we have had problems in the past.  Somebody will punch in and
disappear. *Occasionally someone will get a disciplinary warning for not being at his
work station.  That is a violation of the plant rules, and that is written up under the
disciplinary rules if they do not appear at the work station when they are supposed
to.*

9

HR: So not appearing at your work station in a reasonable period of time is a disciplinary matter and not under the attendance policy?

WL: Right.

HR: Okay.

(98-8418 R.2-Gen'l Counsel's Ex. 24 at 3-4 (emphasis added).) This exchange was followed by a dialogue between Lambeth and Shelton, the employee ultimately discharged for reporting late to his work station. Shelton complained that the new rule resulted in discipline simply when one supervisor in the chain of command did not know the employee's whereabouts, even though another supervisor knew. After this dialogue, Raynor observed that "[y]ou haven't written people up for being late to their work station for a long time before this." (*Id.* at 5.) No charge was filed until June of the following year, after Shelton was fired for repeatedly arriving late to his work station.

The Board and the company agree on the statement of the Board's rule of when the § 10(b) clock starts to tick:

> [T]he 10(b) period does not begin to run until the charging party receives clear and unequivocal notice — *either actual or constructive* — of the acts that constitute the alleged unfair labor practice, *i.e.*, until the aggrieved party *knows or should know* that his statutory rights have been violated. As a corollary — and a fortiori — when a party deliberately misrepresents or conceals from another the operative facts concerning its actions so that the other party is unable, *even through the exercise of due diligence*, to discover those facts, the 10(b) period does not begin to run until the deceived party obtains the relevant facts.

*John Morrell & Co.*, 304 N.L.R.B. 896, 899 (1991) (emphasis added). By permitting the clock to run on constructive notice, and by requiring due diligence to uncover unfair practices, the rule makes clear that the clock can start to tick even if the union does not receive a letter from the company explicitly notifying the union of an unfair labor practice. *See Local 25, Int'l Bhd. of Elec. Workers*, 321 N.L.R.B. 498 (1996) (employee who heard of unfair labor practice in idle chat with fellow union

10

members was sufficiently on notice for time to run, even though she thought the information was just a "rumor"). When the unfair practice has in fact occurred (and not just been threatened), *see Leach Corp. v. N.L.R.B.*, 54 F.3d 802, 807 (D.C. Cir. 1995), and the union has the facts necessary to determine that it has occurred, then the time begins to run.

The clock had begun to tick here. The alleged unfair labor practice had occurred as soon as Dynatron began sanctioning workers for an action — showing up late to one's post — that had not been punishable before. The company did not hide these new punishments; the disciplinary actions were turned over to the union. And as Raynor's remarks at the September 19, 1994 meeting show, the union's fine nose for unfair practices had not failed it: Raynor unequivocally accused the company of having created a new work rule. If this were not enough, a year later Lambeth told Raynor in no uncertain terms that it was a violation of company rules to show up late to your work area.

All the company did not tell the union is that this rule was new. Indeed, the company denied that the rule was new. The Board relied on this denial to find a species of fraudulent concealment. We are not persuaded. The Board's own rule, as stated in *Morrell*, quoted above, permits tolling for fraudulent concealment of "operative facts" only. Whether or not a rule is an impermissible unilateral change is not an "operative fact" but a legal conclusion drawn from historical facts. When Lambeth told Raynor that the rule was not new, Lambeth was simply denying liability. (In any event, Raynor was not persuaded.) Lambeth and the company hid no operative facts — such as who was being disciplined for this infraction, or what the employee manual said. As far as the record shows, all the information that was available to the company was available to the union.

11

Any reasonable application of the Board's own construction of 10(b) would yield the conclusion that the six-month clock started to tick no later than September 11, 1995. The charge accusing the company of firing Lamar Shelton under a unilaterally changed work rule was filed on June 26, 1996. More than six months had passed since it was obvious to the union that a new rule was in place. The charge was time-barred.

In the alternative, the Board held that the company was put on timely notice of the charge by separate charges of unfair labor practices filed on January 18, 1996. Those charges, which are also at issue in this consolidated application for enforcement, accused the company of creating a new disciplinary procedure for material handlers, unilaterally changing parking policy, and unilaterally fixing compensation policy for involuntary plant shutdowns. Under the Board's interpretation of § 10(b), which no one challenges, timely charge allegations can permit pursuit of untimely ones if the "untimely allegations are of the same class as violations alleged in the timely charge" and the timely allegations "arise from the same factual situation or sequence of events as the allegations in the pending timely charge." *Redd-I, Inc.*, 290 N.L.R.B. 1115, 1118 (1988). According to the Board in this case, because the timely allegations involved a unilateral refusal to bargain and the same conduct ("changing employee terms and conditions of employment," (98-8418 R.3 at 666)), the timely allegations support pursuit of the untimely ones.

This application of the Board's rule is unreasonable because it completely ignores the Board's enunciation of the rule. The rule requires the untimely charge to "arise from the same factual situation." *Redd-I, Inc.*, 290 N.L.R.B. at 1118. The Board overlooked the fact that the new tardiness rule had nothing to do with material handling standards, parking, or compensation. The Board in effect rewrote its own rule for this case alone to read that a timely charge can carry an

12

untimely one if they "arise from a similar kind of conduct" rather than "the same factual situation, *id*." The Supreme Court recently reminded the Board that even agency "adjudication is subject to the requirement of reasoned decisionmaking . . . . It is hard to imagine a more violent breach of that requirement than applying a rule of primary conduct . . . which is in fact different from the rule or standard formally announced." *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 118 S. Ct. 818, 827 (1998). The Board did not follow that precept here.

Because the charge for this unfair labor practice was time-barred, we deny enforcement of that part of the Board's order relating to it.

5.      *Security Measures: Employee Parking Spaces and ID Cards*.

The Board concluded that Dynatron had impermissibly unilaterally altered working conditions by replacing first-come, first-served employee parking with assigned spaces. Dynatron does not challenge this finding. It argues, rather, that assigning parking spaces is so trivial a change in working conditions that it falls below the duty to bargain. The company has support from an N.L.R.B. decision for this proposition: the Board has adopted an ALJ opinion holding that moving employee parking spaces is not "material" enough to warrant negotiation. *See Wisconsin Steel Indus., Inc.*, 318 N.L.R.B. 212, 241 (1995). Perhaps because of this, the Board does not defend its order to permit the employees to park freely. We accordingly deny enforcement.

The Board also ordered the company to cease disciplining employees for failing to bring ID badges to work. Dynatron challenges this order on the ground that the ID card policy was consistent with past practice. Again, the Board does not defend this part of its order. We thus deny enforcement.

6.      *Memo to Material Handlers*.

13

The Board also agreed with the ALJ's conclusion that Dynatron had unilaterally implemented a new rule by issuing a memorandum to material handlers informing them that certain errors were subject to discipline, and the Board accordingly ordered the company to rescind the rule. The company challenges this part of the order on the grounds that the memorandum was simply a restatement of past policy, and that it was in any event trivial because the record does not show that anyone was ever disciplined under it. The Board must agree, because it does not defend this part of its order. We accordingly deny enforcement.

7. *Power Outages Compensation Policy*.

The Board adopted the ALJ's conclusion that Dynatron had unilaterally implemented a compensation policy for involuntary plant shutdowns when the company undertook to pay employees according to a certain scheme in the aftermath of Hurricane Opal in October 1995. Dynatron objects to this conclusion, arguing that it followed the same compensation policy the last time it was forced to send hourly employees home, during an ice storm in February 1988. In 1988, when the storm impeded many employees from reaching the plant, employees who did show up for work were turned away and paid four hours' wages. After Opal, when the company again turned employees away (this time because of a power outage), the company again paid the employees four hours' wages. We agree that there is not substantial evidence to support the Board's conclusion that the company's post-Opal policy was new.

The Board's evidence boils down to a quotation removed from its record context and an irrelevant distinction. The first is that the plant manager, according to the Board, admitted at the evidentiary hearing that "there was no policy." The plant manager did use those words, but it is

14

plain from the remainder of the same answer that he was stating that even if he did not label it a

policy, the decision on compensation was made exclusively by reference to precedent:

> Q    At the time you made the decision as to how employees would be compensated for reporting to work on October 5th and 6th, did you explain to Mr. Tomkowicz that in the past, in 1988, a certain policy had been followed?
>
> A    Well, first of all, there was no policy. It was the decision on my part, but Fred Tomkowicz did approach me and ask me how are we going to handle this and that's when I told him that in the past, here's what we have done. And, we followed the same guidelines and then I see that he drew up this letter to inform somebody.

(98-8418 R.1 at 274.) This interpretation of this testimony is confirmed by earlier testimony from

the plant manager, as well:

> Q    Okay. Now, in October of 1995 did you did [*sic*, prob. "tell"] Fred Tomkowicz in the manner in which to compensate those employees.
>
> A    Yes. Fred came to me and wanted to know how do we want to handle this[,] and I told him that I'd gone through this before and here's how we handled it in the past. And the people on the first day of Hurricane Opal [when employees were asked to stay all day, without working], we paid them because they were basically there their full shift. The second day, because we turned them away right away, we paid them for four hours, strictly because it was the same thing we did in '88. We paid them what I call a given, that first four hour segment of their shift, so we paid them for four hours and sent the people home.
>
> Q    Okay. Now was this an established policy at any time or —
>
> A    I wouldn't say it was an established policy. It was a decision I had to make in my position.
>
> Q    Okay. And you made that decision based on what you had done once before in 1988?
>
> A    What I had done in the past, that is correct.

15

(98-8418 R.1 at 249-50.)  The context of the "no policy" statement shows that whether or not the plant manager considered his compensation decision to be under a "policy" (whatever that word may mean to him) the compensation decision was exclusively motivated by a wish to repeat what had been done before unionization —  that is, not to change the rules.  And Dynatron in fact compensated its employees exactly as they were the last time the company had to send employees home when they showed up to work their shift.

The Board tried to get around these facts by saying that Opal was completely different from the 1988 ice storm.  Again, the Board used the plant manager's testimony, this time his statement that there was a difference in the two cases because the plant was operational during the ice storm.  This distinction, however, does not matter.  Whatever the reason (other employees could not get to work in the ice storm; the plant had no power after Opal), in each case the result to the employee was the same: she showed up on time, ready to work, and was sent home.  And in 1988 and 1995, the Board does not dispute, the employees in this situation were treated the same.

The Board's finding that the 1995 compensation was unprecedented thus did not rest on substantial evidence.  The Board does not argue as a legal matter that the decision based on past practice was an unfair labor practice in any event.  We therefore deny enforcement of the relevant parts of the Board's order.

*8.  Firings of Floyd Robin Davis and Lee Carter.*

The Board concluded that the company had fired Davis and Carter for their union activities. The company argues that there was not substantial evidence to support the Board's finding that antiunion animus was a "motivating factor" in Davis's and Carter's terminations.  *N.L.R.B. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 401, 103 S. Ct. 2469, 2474 (1983).  Having reviewed

16

the record, we conclude that the Board's finding is supported by substantial evidence in Davis's case, and the order relating to Davis is enforced without further discussion. Carter's termination, however, is a closer question and requires discussion.

We conclude that the Board's evidence is substantial enough to support its finding, if only barely. Carter, a maintenance worker on the night shift, never formally belonged to the negotiating committee, but he was a vocal supporter of the union and beginning in 1994 wore union T-shirts to work. Carter's feelings were known to management; Carter once refused a request to work overtime by showing the supervisor his union card. Nor was Carter short of complaints about his job. He complained through the union that his job description and pay were inconsistent with his actual job, and he refused on occasion to do certain work because it was beneath him.

The matter came to a head on September 14, 1995, when Carter received conflicting orders from two supervisors. In Carter's version of the story, which the ALJ credited over conflicting versions, one supervisor told Carter to disassemble one machine as quickly as possible. Another supervisor (who may or may not have had authority; the chain of command over Carter was unclear) then informed Carter that a pump he had repaired the day before was leaking, and the second supervisor asked Carter to fix the leak. Carter declined to do so immediately, citing the earlier assignment. As he walked back to the first assignment, Carter pointed at debris on the floor and asked the second supervisor if he would like Carter to pick up the debris and added "I'm getting tired of kissing asses around here like that. . . . [I]t's time somebody kisses my ass . . . ." (98-8418 R.1 at 161.) (The second supervisor, Jerry Talent, testified that Carter in fact refused to pick up the debris, using foul language, and then pursued Talent to tell him "[K]iss my fucking ass." (98-8418 R.1 at 327.)) Talent and Carter proceeded to the assistant plant manager's office, where the human

17

resources manager was also present. They suspended Carter on the spot and fired him four days later for use of profane language and insubordination.

There was evidence that this treatment was harsher than that reserved for other employees who had committed similar offenses. Eric Clemmons received only a written warning after responding "belligerently" (although not with profanity) to a page, even though Clemmons had been belligerent on prior occasions. (98-8418 R.2-Gen'l Counsel's Ex. 16.) A. Craig was suspended three days, and warned that the next offense would result in termination, when he refused to carry out a direct request from his supervisor. (98-8418 R.2-Gen'l Counsel's Ex. 17.) M. Dickerson got only a "verbal" warning (presumably oral) after he kicked a drum across a room when the supervisor asked Dickerson not to sit on the drum. (98-8418 R.2-Gen'l Counsel's Ex. 75.) The company issued Fred Fort a written warning when he became "beligerent [sic]" on being confronted with late arrival to his work station. (98-8418 R.2-Gen'l Counsel's Ex. 76.) While none of these infractions quite rises to the level of Carter's, they do suggest that the company used progressive discipline in other cases, and thus that its termination of Carter may have been motivated by Carter's recent union activities.

We acknowledge that there is evidence tending to contradict the Board's finding. For instance, Carter's employment history may be different from those in which progressive discipline was applied. Carter's work history was mixed; while the company evaluations praised his performance, they also called him "disruptive"[4] and "argumentative"[5] and periodically noted a fractious attitude: In 1992, the evaluation complained that Carter "sometimes becomes involved in

---

[4]    (98-8418 R.2-Gen'l Counsel's Ex. 20 at 3.)

[5]    (98-8418 R.2-Gen'l Counsel's Ex. 18 at 3.)

altercations with other employees that could be avoided," (98-8418 R.2-Gen'l Counsel's Ex. 21 at 2); in 1993, the evaluation observed "an unwillingness to do what is asked of him & a rebellious attitude," (98-8418 R.2-Gen'l Counsel's Ex. 18 at 2); in March 1994, the evaluation noted that "at times [Carter] lets his personal emotions & feelings get in the way of his job performance," (98-8418 R.2-Gen'l Counsel's Ex. 19 at 2); and in September 1994, the evaluation again noted that "many times Lee allows his emotions & personal feelings interfere [*sic*] with his job performance," (98-8418 R.2-Gen'l Counsel's Ex. 20 at 2).

But this evidence, taken as a whole, can support at least two inferences: first, the Board's inference that Carter's union activities were the last straw and thus the motivating factor in Carter's termination, or second, that Carter's union activism was inseparable from his poor attitude as an employee, which is a legitimate ground for firing. The Board chose the first inference, and because it has substantial record support we must accept it. We accordingly enforce those portions of the Board's order relating to Carter.

### III. Conclusion

For the foregoing reasons, the Board's order of July 16, 1997 is enforced in its entirety. The Board's order of September 30, 1997, is enforced except for the following parts: (1)(a)(1), (1)(a)(2), (1)(a)(3), (1)(a)(5), (1)(b), (2)(a) (to the extent it orders reinstatement of Lamar Shelton), (2)(b) (to the extent it requires the company to make Lamar Shelton whole), (2)(c) (to the extent it requires purging Lamar Shelton's personnel file), (2)(d) (to the extent it requires bargaining on the terms and conditions of employment excluded from enforcement in (1)(a)), (2)(e) (to the extent it requires rescinding the rules excluded from enforcement in (1)(a)), and (2)(g)-(k) (although the Board may

19

require dissemination of a notice that is redacted to remove all references to the unenforced parts of its order).

ORDER ENFORCED IN PART AND DENIED ENFORCEMENT IN PART.