[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-12825
Non-Argument Calendar

_____

Agency No. 12-CA-24810

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 20, 2006
THOMAS K. KAHN
CLERK

LAKE MARY HEALTH CARE ASSOCIATES, LLC,
d.b.a. Lake Mary Health and Rehabilitation,

Petitioner-
Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-
Cross-Petitioner.

_____

Petition for Review of a Decision of the
National Labor Relations Board

_____

**(December 20, 2006)**

Before BLACK, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Lake Mary Health Care Associates, LLC ("Lake Mary") petitions for review of the April 28, 2006 order of the National Labor Relations Board ("the Board"). In that order, the Board found that Lake Mary had engaged in unfair labor practices by refusing to bargain collectively with employee representatives, in violation of section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5) ("NLRA"). The Board filed a cross-application to enforce its order. After review, we deny Lake Mary's petition and grant the Board's cross-application.

## I. FACTUAL BACKGROUND

Lake Mary operates a nursing home and rehabilitation center. The Service Employees International Union, Local 1199 ("the Union") represented a unit of Lake Mary's service employees. Three-quarters of the 92-employee unit was comprised of certified nursing assistants ("CNA").

On August 9, 2004, an employee in the unit represented by the Union filed a decertification petition with the Board seeking to decertify the Union. Consequently, an election was scheduled for September 17, 2004 to determine whether the unit employees wished to continue being represented by the Union.

For several years, Lake Mary had paid its CNAs a $25.00 shift bonus if they worked an extra shift in addition to their 40-hour week. On September 15, 2004, two days before the scheduled election, Lake Mary's scheduling secretary, Martha Rodriguez, posted a notice on the extra-shift sign up sheet indicating that there

would be no bonus. Rodriguez did so at the direction of Pat Mulkey, Lake Mary's director of nursing. Rodriguez also told CNAs whom she encountered that day that Lake Mary would no longer pay extra shift bonuses.

As word spread of the change, some CNAs on the night shift complained to Rodriguez. Rodriguez passed those complaints on to Mulkey.

On September 16, 2004, Mulkey spoke with Lake Mary's administrator, Maureen Kehoe, who explained that the extra-shift bonuses should be given. Mulkey returned to Rodriguez and stated that they had "made a mistake."

At 2:30 p.m. on September 16, Rodriguez took down the sign up sheet with the "no bonuses" notice. Rodriguez also told CNAs who had signed up for extra shifts and any CNAs she encountered at the facility until she left work at 5:00 p.m. that extra-shift bonuses would be given. When Rodriguez returned to work at 6:15 a.m. on September 17, 2004 – the morning of the election –, CNAs continued to question her about the elimination of the extra-shift bonus. Rodriguez told them that extra-shift bonus would be given.

On September 17, voting occurred between 6:30 a.m. and 8:30 a.m. and again between 2:00 p.m. and 4:00 p.m. Out of 92 eligible voters, 40 voted against union representation and 37 voted in favor, with one challenged ballot.

The Union filed election objections, alleging, inter alia, that Lake Mary's change in the extra-shift bonus on the eve of the election was conduct that tended

3

to interfere with the free expression of employee choice in the election. A Board hearing officer conducted a hearing at which the parties were able to present evidence. Thereafter, the hearing officer recommended that the Board sustain the Union's objection relating to the change in extra-shift bonuses and that a new election be held. After considering Lake Mary's exceptions, the Board adopted the hearing officer's report and recommendation and directed a second decertification election. See Lake Mary Health Care Assocs., L.L.C., 345 N.L.R.B. No. 37, 2005 WL 2115871 (2005).

On October 28, 2005, a second election was held, and the Union won by a vote of 40 to 36, with two challenged ballots. On November 10, 2005, the Board's regional director certified the Union as the collective bargaining agent for Lake Mary's CNAs.

Despite certification, Lake Mary refused to comply with the Union's request to bargain. The Union filed a charge of unfair labor practice with the Board. The Board's general counsel filed a complaint against Lake Mary based on the Union's charge. Lake Mary filed an answer admitting its refusal to bargain, but contending that it was not obligated to bargain with the Union because the Board had erred in setting aside the first election and directing a second election. The Board's general counsel moved for summary judgment, which the Board granted.

4

Specifically, the Board concluded that Lake Mary had engaged in unfair labor practices by refusing to bargain with the Union and thus violated sections 8(a)(1) and (5) of the NLRA and ordered Lake Mary to cease and desist and to bargain upon the Union's request. As for Lake Clare's argument that the Board had erred in directing the second election, the Board concluded that this argument raised representation issues that "were or could have been litigated in the prior representation proceeding" and that Lake Mary had not presented any new evidence or special circumstances that required the Board to re-examine its prior decision to set aside the first election and direct a second election. Thus, the Board concluded that Lake Mary "ha[d] not raised any representation issue that [wa]s properly litigable in this unfair labor practice proceeding." Lake Mary Health Care Assocs., L.L.C., 346 N.L.R.B. No. 103, 2006 WL 1168873 (2006). Lake Mary filed this petition for review and the Board cross-petitioned seeking enforcement of its order.

## II. DISCUSSION

The NLRA prohibits an employer from interfering with its employees' exercise of their NLRA rights and from refusing to bargain with its employees' duly certified representative. See 29 U.S.C. § 158(a)(1), (5). It is undisputed that Lake Mary refused to bargain with the Union. The only issue on appeal is whether the Union was duly certified.

5

Lake Mary argues that the Union was not duly certified because the Board erroneously invalidated the results of the first decertification election, in which union representation was defeated. According to Lake Mary, the record does not support the Board's conclusion in the representation proceeding that the change in the extra-shift bonus improperly interfered with employees' free choice in the first decertification election.[1]

The ultimate question in representation election cases is whether the challenged conduct "created an environment of tension or coercion which precluded employees from exercising a free choice." TRW-United Greenfield Div., 716 F.2d 1391, 1394 (11th Cir. 1983). "For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls." Id. (quotation marks omitted).

The burden is on the party objecting to the conduct to prove by specific evidence that the conduct "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." N.L.R.B v.

---

[1]The NLRA does not provide for direct review of a representation election proceeding. Therefore, "where unfair labor practice is charged for refusal to bargain, and the employer has refused to recognize the certification, the election proceeding is before the court for review. The representation case and the unfair labor practice case become as one and the complete record is fully reviewable." U.S. Rubber Co. v. N.L.R.B., 373 F.2d 602, 604 n.3 (5th Cir. 1967); see also 29 U.S.C. § 159(d).

Gulf States Canners, Inc., 585 F.2d 757, 759 (5th Cir. 1978) (quotation marks omitted).[2]  In determining whether the objecting party has proved the effect of particular conduct on a representation election, we apply the "tendency-to-influence test" rather than speculate about the "subjective reaction of employees to electioneering . . . ."  Id.  Under the tendency-to-influence test, the Board must assess "whether the questioned action by an election candidate had a tendency to influence the outcome of the voting."  Id.[3]

Substantial evidence supports the Board determination that Lake Mary's announced elimination of the extra-shift bonus was conduct that warranted setting aside the first decertification election.  Evidence in the record indicates that the abrupt change in such a long-established monetary benefit created an atmosphere of confusion and alarm that continued up to the minutes before the polls opened.

---

[2]This Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1982) (en banc).

[3]"Determination of whether a union representation election was unfairly conducted and should be set aside is primarily a question for the National Labor Relations Board."  TRW-United Greenfield Div. v. N.L.R.B., 716 F.2d 1391, 1393 (11th Cir. 1983).  "Because it is for the Board to decide if the conduct charged reasonably tends to interfere with the employees' free choice, this Court, in reviewing this decision, must be slow to overrule a discretionary determination by the Board."  N.L.R.B. v. Golden Age Beverage Co., 415 F.2d 26, 29 (5th Cir. 1969) (citations and quotation marks omitted).  To this end, "[w]hether this Court would reach the same conclusion as the Board from the conflicting evidence is immaterial, so long as the Board's finding that the election was fairly conducted is supported by substantial evidence in the record considered as a whole."  Id.; see also N.L.R.B. v. Dynatron/Bondo Corp., 176 F.3d 1310, 1313 (11th Cir. 1999); 29 U.S.C. § 160(e).  We uphold the Board's legal conclusions unless they are "arbitrary or contrary to the law."  N.L.R.B. v. Dynatron/Bondo Corp., 992 F.2d 313, 315 (11th Cir. 1993).

The elimination of the bonus came just two days before the election and after Lake Mary had waged a vigorous anti-union campaign. Therefore, the timing of and context within which the announced change in benefits occurred supports an inference that it was tied to the campaign. Under these circumstances, the CNAs reasonably could have interpreted the bonus elimination to be an attempt by Lake Mary to influence their votes against the Union as an unsuccessful advocate for the employees. Specifically, as the Board stated, "the unilateral elimination of a longstanding economic benefit 2 days before the election would reasonably send a message to unit employees that the seeming inability of the incumbent Union to protect them from the Employer's detrimental actions made the Union's continued presence as a bargaining representative pointless." Lake Mary, 2005 WL 2115871, at *2. Therefore, Lake Mary's elimination of the bonus was sufficiently coercive.

In addition, the first decertification election was very close – 40 to 37 against the Union. A change in just a few votes would have altered the outcome. See N.L.R.B. v. Overland Hauling, Inc., 461 F.2d 944, 946-47 (5th Cir. 1972) ("Conduct which could have affected only a few voters may not have any effect on the ultimate outcome of the election in cases where the vote disparity is large, but the same conduct in a close election could be determinative."); Gulf States Canners, 585 F.2d at 759 ("[W]hen, as is the case here, a change of only a few votes would affect the outcome of the election, less egregious actions may require

8

a rerun of the election than a case in which a clear-cut choice has emerged from the balloting."). Although Lake Mary reinstated the extra shift bonus just prior to the election, all of the CNAs were not notified of this change of heart before the polls opened. Instead, Lake Mary relied upon "word of mouth." Given the extremely narrow voting margin and all the other circumstances surrounding the elimination of the bonus, substantial evidence supports the Board's finding that Lake Mary's conduct had a tendency to influence the results of the election.

Lake Mary argues that the Union, as the objecting party, failed to meet its burden to show that Lake Mary intentionally eliminated the bonus to affect the election. The objecting party, however, need not show an intent to influence the election. See Gulf States Canners, 585 F.2d at 759. Rather, "[i]n determining whether an election should be invalidated, the focus should be on the effects of a particular act on the electorate rather than on the actor's intent." Id.

Lake Mary also argues that, even if intent was not necessary, the Board nonetheless made an unsupported finding that Lake Mary acted with intent. Lake Mary points to unrebutted evidence in the record showing that the elimination of the bonus was a mistake resulting from a miscommunication. Lake Mary further contends that the Board "effectively" shifted the burden of persuasion to the Employer by ignoring the unrebutted evidence of innocent mistake.

9

These arguments are without merit. The Board did not find that Lake Mary intentionally eliminated the bonus in an effort to affect the election. Indeed, the Board explicitly rejected Lake Mary's argument that intentional conduct was necessary and instead focused on whether the conduct tended to effect the election, as follows:

> In determining whether conduct is objectionable, the Board does not inquire whether the employer's actions were intentional or actually affected the results of the election. The test is not a subjective one, but an objective determination of whether the conduct of a party to an election has the tendency to interfere with the employees' free choice.

Lake Mary, 2005 WL 2115871, at *2. The Board further stated that Lake Mary's subjective intent was "not germane to whether the conduct was objectionable." Id. Instead, in concluding that the Union met its burden, the Board relied upon "the timing of the announcement of the elimination of the bonus 2 days before the election, the wide dissemination of the announcement, the closeness of the vote and the Employer's failure to effectively inform employees that the bonus had been restored." Id.

Finally, Lake Mary also argues that the elimination of the extra-shift bonus was de minimis because it lasted only 24 hours and was rescinded before the election began. The Board has long held that conduct during a "critical election period," that is itself a violation of Section 8(a)(1) of the NLRA, is "a fortiori" conduct that interferes with the results of the election. Airstream, Inc., 304

10

N.L.R.B. 151, 152 (1991). However, the Board has carved out a narrow exception to this per se rule where the conduct "is so de minimis that it is virtually impossible to conclude that [the violation] could have affected the results of the election." Id. (quotation marks omitted).

This is not a case in which the Board concluded that the challenged conduct itself was an unfair labor practice that violated Section 8(a)(1). Indeed, the Board explicitly declined to do so, instead concluding that the elimination of the bonus interfered with the election independent of any Section 8(a)(1) finding. Lake Mary, 2005 WL 2115871, at *3. Furthermore, given the circumstances already discussed – the timing of the elimination of the bonus, the widespread dissemination of the change in policy and the resulting tension in the workplace, the closeness of the vote, etc. – it is not "virtually impossible" to conclude that the elimination of the bonus affected the election results. Therefore, we cannot say that Lake Mary's conduct, even assuming arguendo it was a violation of Section 8(a)(1), was de minimis.

For the reasons discussed, we deny Lake Mary's petition for review and grant the Board's cross-application for enforcement.

**PETITION FOR REVIEW DENIED; ENFORCEMENT GRANTED.**

11