[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10594

_____

NLRB Nos. 12-CA-19668 & 12-CA-1

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

GOYA FOODS OF FLORIDA,

Respondent,

UNITE HERE,

Intervenor.

_____

Application for Enforcement of an Order
of the National Labor Relations Board

_____

**(April 24, 2008)**

Before ANDERSON and BARKETT, Circuit Judges, and TRAGER,* District
Judge.

_____

*Honorable David G. Trager, United States District Judge for the Eastern District of New York,
sitting by designation.

ANDERSON, Circuit Judge:

## I. INTRODUCTION

The National Labor Relations Board ("NLRB") petitions this Court for enforcement of its August 30, 2006, order that would impose, <u>inter alia</u>, an affirmative bargaining order on Goya Foods of Florida ("Goya") to bargain with UNITE HERE, a union that was certified to represent Goya's warehouse and sales unit at its Miami, Florida, facility. This is an unlawful withdrawal of recognition case that arises in the context of a campaign by Goya's management to dissuade union activity during 1998 and 1999. The Regional Director of the National Labor Relations Board brought fifteen charges against Goya in 2000. In February of 2001, the administrative law judge ("ALJ") determined that Goya committed extensive National Labor Relations Act ("NLRA") violations, including wrongful discharges, unlawful refusals to bargain, and pre-petition labor organizing violations. Unfortunately, the Board failed to act on the administrative law judge's well reasoned opinion for more than five years and did not issue its order until August of 2006.

In this contested enforcement action, Goya first asserts that there is not substantial evidence to support the Board's findings. Goya's central argument is, however, that the lengthy delay in this case and the attendant changes to Goya's

policies, employee composition, and management require this Court to deny enforcement or, at least, remand the case to the Board in order for it to assess the necessity of its ordered remedy in light of changed circumstances.

As an initial matter, we find that there is ample evidence to support the Board's findings, and that its analysis adequately considered factors appropriate to issuing an affirmative bargaining order. On the changed circumstances issue, we first discuss our decision not to entertain a challenge to the Board's denial of Goya's post-decision motion urging the Board to reconsider and reopen the record to receive evidence of changed circumstances proffered by Goya for the first time. In that peculiar posture, we then decline to impose upon the Board a <u>sua sponte</u> duty to solicit new evidence that has long been known to Goya but not presented to the Board. Although the Board's delay in ruling in this case is of considerable concern, the peculiar posture of this case and the particularly egregious nature of Goya's unfair labor practices persuade us that enforcement of the Board's order should not be denied in this case.

## II.  FACTS

Goya Foods is an international Hispanic foods distributor, based in New Jersey, with a warehouse operation in Miami, Florida. On September 2, 1998, UNITE HERE ("the Union") filed a petition with the Board seeking to represent

workers in two divisions of Goya's Miami warehouse facility. At the Miami facility, Goya employs individuals to package and sort food in its warehouse, drivers to deliver its products, and salespersons to sell and stock those products. On or about October 26, 1998, the Board certified the Union as the exclusive collective bargaining representative of the warehouse workers and drivers after an overwhelming victory, 47 to 7, with two challenged ballots. On December 4, 1998, the Board certified the Union as the exclusive collective bargaining representative of the salesperson unit, following a less overwhelming but nevertheless clear victory, 36 to 24.

In connection with its unionizing efforts, beginning on September 16, 1998 and updated thereafter, the Union filed charges against Goya with the local NLRB office in Miami alleging violations of various sections of the NLRA. On April 18, 2000, based on these charges, the Board's Acting Regional Director filed a complaint against Goya for numerous violations of sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA. The complaint alleged that Goya had interfered with, restrained, or coerced employees in the exercise of their rights to unionize in violation of section 8(a)(1); discriminated against employees in their retention and the terms of their employment for exercising protected rights in violation of section 8(a)(3); and, refused to bargain collectively with the Union in violation of section

8(a)(5).[1]  See 29 U.S.C. §§ 158(a)(1), (a)(3), (a)(5) (2006).

The complaint alleged numerous violations of the NLRA.  Among these were allegations that Goya violated section 8(a)(1) with precertification promises and threats intended to discourage employee support for the Union.  Post-election, Goya was alleged to have violated sections 8(a)(1) and 8(a)(3) when it fired three employees who were active in the Union because of their participation in a protest at a local Winn-Dixie store on June 30, 1999.  Additionally, Goya was alleged to have violated section 8(a)(3) when it underemployed another active union employee after the employee discovered a rat infestation in a box of product he was using to stock shelves at another Winn-Dixie store.  Finally, the complaint alleged violations of section 8(a)(5) based on Goya's refusal to recognize the Union, its unilateral changes to certain policies, and its refusal to permit union designates to represent employees.

The ALJ's findings establish a widespread and lengthy anti-union campaign by Goya's then-president Mary Ann Unanue and other members of Goya's

---

[1] The relevant statutory sections read as follows.  Section 8(a)(1) makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  29 U.S.C. § 158(a)(1) (2006).  Section 8(a)(3) makes it unlawful for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  Id. § 158(a)(3).  Section 8(a)(5) makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."  Id. § 158(a)(5).

management from precertification up to and through the unlawful withdrawal of recognition, which involved Goya management in the circulation of the disaffection petition.[2]  There were numerous unlawful and coercive interrogations and threats to workers by Goya officials prior to union certification.  Specifically, Goya's then-president, Ms. Unanue, conducted coercive interrogations of employees in an effort to gather information on union organizing.  At an employee meeting, she reminded employees that union organizing had forced Eastern Airlines into bankruptcy.  She also threatened unilateral action against the employees that would result in job loss, suggesting the futility of union organizing

---

[2] The Board's opinion does not recount each precertification violation, nor did Goya challenge these specific violations.  The ALJ discussed these findings at length in its opinion.  Goya's failure to challenge these violations before the Board bars this Court from hearing any challenge to the precertification violations.  29 U.S.C. § 160(e); see also Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665, 102 S. Ct. 2071, 2083 (1982).

Goya argues, however, that because the Union ultimately secured certification, these precertification actions are irrelevant to the question of unlawful withdrawal because the intervening lawful election attenuates the purported violations.  In our view, Goya's post-election conduct amply demonstrates that the company intended to make good on its pre-election threats that it would not bargain with the Union.  There is, therefore, a relationship between the pre-election and post-election conduct in this case that, as the Seventh Circuit recognized in Ron Tirapelli Ford, makes it difficult to draw a practical distinction between the type of conduct at issue.  See Ron Tirapelli Ford, Inc. v. NLRB, 987 F.2d 433, 443 (7th Cir.1993) ("Indeed, as the facts of this case amply demonstrate, in employer-assisted decertification petition situations, there is, as a practical matter, a certain artificiality in drawing a rigid distinction between pre-petition and post-petition conduct."); see also Purolator Armored, Inc. v. NLRB, 764 F.2d 1423, 1429 (11th Cir. 1985) ("[The Company] has been found guilty of numerous section 8(a)(1) violations.  These actions demonstrate that [the Company] was staunchly opposed to unionization of its employees and was willing to commit a variety of unlawful acts to defeat the Union.  As such, they form the background of our evaluation of the alleged section 8(a)(3) violation.").

efforts prior to the election. At a company meeting, Ms. Unanue informed those who would become union members that they would not be eligible for Goya's pension plan. Ms. Unanue consistently spread the message to Goya employees that if they unionized, they would lose present benefits and that bargaining would start at "zero." There were also threats of plant closures in the event of unionization. The ALJ found, in addition to the threats and intimidation, that Ms. Unanue also made promises to at least one group of workers, night-shift employees, that disagreeable assignments would be transferred to another group, in an attempt to block certification of the Union. Finally, and significantly, Ms. Unanue and other members of management told numerous different groups of employees on multiple occasions that Goya would never recognize a union, and would not bargain with the Union even if the employees voted to unionize. (ALJ at 12.)[3]

Despite these precertification violations, the union won both elections with majority support of the workers. However, problems with management continued after the elections. During the certification year, the company only met with the Union twelve times–eight times for the warehouse employees and four times for the salespeople–and failed to come to any kind of agreement with the Union.

---

[3] Our citations to the ALJ's opinion are to the opinion as appended to the Board's order; the ALJ's opinion therein begins on page 10 of the Board's slip opinion, which is document number 26 in the enforcement record.

Goya ultimately followed through on its pre-certification threats not to recognize or bargain with the Union. During the Union's first–and only–year of certification, Goya was charged with numerous acts of refusing to recognize the Union. Among the incidents found by the ALJ, employees were told directly by management officials that Goya "would not recognize the authority of 'employee representatives.'" (ALJ at 20.) On numerous occasions, Goya specifically rejected requests by employees to have union representatives present when the employees were having personnel issues. For example, an employee was told by one manager, Maria Cristina Banos, that Goya would not recognize a union delegate. Another was told that Goya would not recognize union delegates until there was a signed contract. (Id.) The warehouse manager told employees that the Union would "never" obtain a contract with Goya. (Id.) Goya's attorney even wrote a letter stating that Goya would not recognize the authority of "employee representatives." (Id.) The ALJ found that the net effect of these actions was "to reverse the outcome of the election by ignoring the Union." (Id.)

Goya also, during the certification year, instituted unilateral changes to several policies–those which are the "bread and butter" of labor issues–including route scheduling and the use of temporary employees. (Board at 5.) Goya argued that it used temporary workers prior to unionization and was therefore not altering

8

the status quo.  The ALJ, however, found that Goya "routinely bypassed the Union and instituted unilateral changes at will" in violation of section 8(a)(5).  (ALJ at 22.)  In sum, Goya "ignored the Union and instituted unilateral changes in complete disregard of the Union's status as the certified collective-bargaining representative of the unit employees."  (ALJ at 21.)

On June 30, 1999, as part of the Union's ongoing efforts to bring health and workplace safety issues to Goya's and the public's attention,[4] the Union organized a public protest outside of a Miami Winn-Dixie store.  The protest involved speeches from union officials and employees and, additionally, displayed a large inflatable rat on the premises.  Goya indicates that 1000 protesters were present, largely drawn from the Union's annual meeting held contemporaneously in Miami.  During the protest, the Union's president and other high ranking officials led three employees (for a total group of about ten) into the Winn-Dixie store to deliver a letter to the store manager in support of the Union's efforts to solicit Goya's customers to address the Goya sanitation and safety issues.  The ALJ decided, upon viewing the videotape of the incident, that the group had a "purposeful walk" into

_____

[4] Employees discovered evidence of a rodent infestation at the Goya facility.  Goya maintains that the rodent infestation, which was determined by Food and Drug Administration officials not to have been the product of food tampering, was nevertheless orchestrated by union officials and sympathizers.

9

the store, and, in the process of requesting to speak with the manager, shouted

loudly for less than a minute.[5]  The group was met by Winn-Dixie security and

police officers, and upon being told to leave, left the store without further incident.

The entire in-store action lasted for approximately four minutes.  The protesters left

the letter for the store manager on the sidewalk in front of the store.

Goya ultimately discharged the three employees who entered the store –

Alberto Turienzo,[6] Humberto Galvez, and Jesus Martin – after Mary Ann Unanue

identified the individuals from a photograph taken by a Goya employee at the

protest.  Goya argued before the ALJ that the protest, which it characterized as

bordering on violent, was urging a boycott of Goya and was therefore unprotected.

Because the ALJ concluded that entry into the store was a "nonviolent solicitation

of Winn-Dixie's support in dealing with the dispute with Goya," it found the

discharges to be in violation of the NLRA because the employees were engaged in

_____

[5] We have viewed the video of the protest and in-store commotion and agree with the ALJ's description of events.  Although the protesters were shouting inside the store and do cause some commotion upon their arrival, it was short-lived and peaceful.  It is also unclear to what extent the individual employees participated in the shouting, as opposed to the union organizers. For sure, the employees, who are all wearing light blue shirts, play an insignificant role in the overall event inside the store.  We cannot tell, after multiple viewings, that any employee does any shouting.  Moreover, the commotion was caused not just by the ten protesters but by the police and media presence that surrounded them.

[6] Turienzo is the only employee Goya identifies as having actually spoken while inside the store.  At the hearing before the ALJ, Turienzo denied speaking while inside the store. Turienzo, and the other two employees, had all previously registered complaints with the state of Florida regarding Goya's rodent problem.

protected activity while inside the store.  (ALJ at 17.)

Two days after the protest, another active Union member and ten-year Goya employee, Reinaldo Bravo, discovered a rodent's nest with several baby rats nesting inside a box of "Mojo sauce" that he was using to stock shelves at another Winn-Dixie store.  In consultation with the store manager, Bravo took photographs of the nest and ultimately removed the product from the shelf.  Upon leaving the store, Bravo contacted the local union before responding to Goya's request for him to return to the warehouse immediately.  Bravo also denied having photographs when Goya asked him for them.  When he arrived back at Goya, he met voluntarily with the FDA investigators who were there to investigate the incident, but he was not permitted to have his union representatives with him.  Although the FDA cleared him of any wrongdoing or tampering, Bravo was initially told that he was no longer to service Winn-Dixie stores and he was also temporarily suspended. Winn-Dixie, in fact, temporarily halted all deliveries from Goya to any of its South Florida stores, due to the rodent problem,[7] but later relented.  Bravo, however, never returned to sales work at any Winn-Dixie store, although he was told that this change was per Winn-Dixie's request and not at Goya's discretion.  Bravo lost

_____

[7] During Winn-Dixie's own inspection of Goya's rice and bean area of the Miami warehouse, Winn-Dixie discovered evidence of a rodent problem shortly before this incident involving Bravo.

11

approximately half of his income as a result. Goya initially refused to assign Bravo new stores because it suspected Bravo of tampering with the boxes.[8] Bravo later lost another store – purportedly due to poor service – but despite the store's assurance that Bravo could return to the store if he devoted himself 100% to the job, he was not reinstated at that store. Even though Bravo admitted lying to Goya regarding the photographs, the ALJ determined that there was sufficient evidence to demonstrate that Goya violated sections 8(a)(1) and 8(a)(3) in its refusal to restore Bravo to his pre-incident work level.

Not surprisingly, the Union's support diminished during its turbulent first year of certification. Goya claims that the Union's tactics (purported harassment of employees who pulled away from the Union) were responsible for its lost support. However, the ALJ found that "the lengthy course of unfair labor practices" directly caused the union to lose support. (ALJ at 23.) Furthermore, the ALJ found that Goya management and Frank and Bob Unanue in particular were involved in the circulation of disaffection petitions in December 1999, which – for at least the sales unit – occurred prior to the one-year decertification bar.[9] Ultimately, a majority of

---

[8] The FDA investigation revealed no evidence of tampering.

[9] The Union was certified as the collective bargaining representative for the sales unit on December 4, 1998, and decertified on December 7, 1999, but the ALJ found the disaffection unlawful because the petition was circulated within the first year of certification, because Goya management was involved in the petition process, and because the disaffection was caused by

employees in both units signed the petition and the Union was decertified for the sales unit on December 7, 1999, and the warehouse unit on December 15, 1999. A little more than a month later, a petition of support for the Union was signed by a majority of the warehouse unit and delivered to the warehouse manager. (ALJ at 23.)

The ALJ held hearings in this case over thirteen days from June 5 to June 21, 2000, and issued its opinion finding numerous violations as charged and recommending an affirmative bargaining order on February 22, 2001. After the taking of exceptions and thorough briefing concluded in late June 2001, no action occurred in the case before the Board's August 30, 2006 decision and order.[10] The Board's order adopted, with modifications,[11] the findings and recommendations of the ALJ and appended his decision to its order. After the Board issued its order,

---

Goya's unfair labor practices. (ALJ at 23.)

[10] There is no evidence in the record to suggest the cause for this delay. At oral argument, counsel for the Board suggested that the Board, despite its best efforts, faces turnover, vacancies, and administrative difficulties that make rendering prompt decisions unrealistic at times. Nevertheless, we are troubled by the length of the delay in this and other cases, see e.g., NLRB v. U.S.A. Polymer Corp., 272 F.3d 289, 293 (5th Cir. 2001) (dealing with a four and a half year delay from ALJ opinion to Board order). It is quite unfortunate that we must now determine what to do in a case such as this where nearly ten years have passed from the initial unfair labor practice charges and this Court's enforcement of a Board order.

[11] The Board's modifications are not at issue here and therefore we have drawn the facts from both the thorough administrative law judge's opinion and the Board's order, as well as our review of the record.

Goya made a motion to stay and a timely motion to reconsider and reopen the hearing to introduce new evidence of changed circumstances, including evidence related to technological changes in the company's structure – namely, a new computer system for calculating driver's routes – and employee turnover. The Board denied these motions on December 15, 2006, and then, on February 7, 2007, filed this enforcement action.[12]

## III.  STANDARD OF REVIEW

Our review of the Board's order is limited.  "It is for the Board to regulate its own procedures and interpret its own rules, so long as it does not act unfairly or in an arbitrary and discriminatory manner."  Piggly Wiggly, Tuscaloosa Div. Commodores Point Terminal Corp. v. NLRB, 705 F.2d 1537, 1539 (11th Cir. 1983) [hereinafter Piggly Wiggly] (internal quotation omitted).  The Board's factual findings will be upheld if they are supported by substantial evidence on the record considered as a whole.  29 U.S.C. § 160(e) (2006); Allentown Mack Sales &

---

[12] Goya has asserted in its brief that the doctrine of laches should bar enforcement of this action because of the delay from Board order to the filing of this enforcement action.  We reject this argument.  The statute giving rise to this enforcement action, 29 U.S.C. § 160(e), does not place a time limit on NLRB enforcement actions, and therefore this Court has jurisdiction to consider the action, regardless of any NLRB delay.  The Board's delay – principally the delay from the ALJ opinion to Board order – may have bearing on the outcome of the enforcement action, but it does not affect this Court's ability to hear the enforcement action on the merits.  Although the doctrine of laches may apply to bar some enforcement actions, this is not such a case.  See Seafarers Int'l Union v. NLRB, 895 F.2d 385, 386 (7th Cir. 1990) (recognizing that laches sets the outer limit on delay between order and enforcement action).

Service, Inc. v. NLRB, 522 U.S. 359, 366, 118 S. Ct. 818, 823 (1998). "We are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial." Vincent Indus. Plastics, Inc. v. NLRB, 209 F.3d 727, 734 (D.C. Cir. 2000). Similarly, we are ordinarily bound by an ALJ's credibility determinations: "[A]s a general rule courts are bound by the credibility choices of the ALJ, even if they 'might have made different findings had the matter been before [them] . . . de novo.'" Ona Corp. v. NLRB, 729 F.2d 713, 719 (11th Cir. 1984) (citation omitted). However, an ALJ's credibility determinations will not bind the Court when they are "inherently unreasonable or self-contradictory" or when they are "based on an inadequate reason, or no reason at all." Id. (internal citations and quotations omitted).

We must also give significant deference to the Board's chosen remedy: "In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." NLRB v. Gissel Packing Co., 395 U.S. 575, 613 n.32, 89 S. Ct. 1918, 1940 n.32 (1969). But this deference is not limitless. The Board must provide a reasoned assessment to justify its choice of an affirmative bargaining order before a court of

15

appeals will enforce a bargaining order.  See, e.g., <u>Vincent Indus. Plastics, Inc.</u>, 209 F.3d at 734.

## IV. DISCUSSION

### A. Substantial Evidence Supporting the Board

Goya first argues that the Board's findings are not supported by substantial evidence.  Goya makes two principal challenges to the Board's decision: (1) the employees' terminations were lawful because anti-union animus did not motivate their dismissals and, therefore, the dismissals were solely the result of the employees' unprotected activity; and, (2) Goya's withdrawal of recognition was lawful because it was not the result of unremedied labor violations because the coercive effect of past violations was diminished and attenuated.[13]  After oral

---

[13] Goya also argues that the Board erred when it failed to recognize Goya's proper exceptions to the findings of numerous section 8(a)(5) and 8(a)(1) violations.  We observe that Goya failed to make any specific objection to any of the ALJ's findings as to all precertification violations as charged and found by the ALJ in the first twelve pages of its decision, with the exception of paragraph 4, which challenged the finding that one employee, Juan Carlos Gonzalez, was threatened with termination by Mary Ann Unanue prior to the union election.  Otherwise, all of Goya's specific exceptions refer only to post-certification action.

Goya also argues in this enforcement action that the ALJ made findings not charged by the NLRB and therefore Goya did not have an opportunity to challenge those findings before the ALJ, which was a denial of due process.  Although Goya is correct that it has a right to full and fair notice of the allegations against it, with an opportunity to litigate these issues, <u>see</u> <u>Castaways Hotel & Casino</u>, 284 NLRB 612, 614 (1987), because the Company did not raise its due process argument before the Board, this Court does not have the power to review it here on appeal under 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").  Goya only raised a due process

argument and careful consideration, we are satisfied that there was ample evidence before the Board of extensive unfair labor practices to support finding numerous labor law violations prior to, leading up to, and causing the unlawful withdrawal of recognition. Indeed, the record reveals violations of a widespread and serious nature; the pervasive atmosphere of anti-union animus tainted the employees' discharges, as well as the ultimate withdrawal of recognition.

Goya challenges the ALJ and Board findings that the three discharged employees' actions at the Winn-Dixie protest were protected under the Act. Our own viewing of the Winn-Dixie protest video gives us no reason to question the ALJ's judgment that the protestors were engaged in a lawful labor-related action and that their activities inside the store did not take them outside the protection of the Act. We think the relatively brief nature of the disruption – the shouting lasted only for one minute – and the peaceable nature of the protesters – they left upon being confronted by the police and spoke in normal tones thereafter – offer substantial evidence to support the Board. Further, the three Goya employees did

<hr/>

argument in its brief in response to the Union's cross-exceptions to the ALJ's opinion; those exceptions were not adopted by the Board and therefore Goya's argument was moot.

Moreover, we note that our review of the consolidated complaint in this case, which was expansive and far-reaching, satisfies us that Goya was on sufficient notice of the relevant claimed unfair labor practices. We cannot fairly say, given the extensive factual findings made by the ALJ based on the testimony of numerous witnesses, that Goya was not given an opportunity to litigate the issues, including allegations of precertification violations.

not play a noticeable role in the in-store action; indeed, the Goya representative who was present and took photographs did not indicate to Mary Ann Unanue that he believed the employee's actions were improper. Mere participation, without awareness of the unlawful character of the acts of others, does not give rise to imputed liability. See MP Industries, Inc., 227 NLRB 1709, 1710 (1977) ("It is well established that the mere fact that an employee was in the company of another employee who commits an act of misconduct will not taint the first employee, without a showing of complicity on the part of that employee in the wrongful activity."), overruled in part on other grounds by Clear Pine Mouldings, 268 NLRB 1044 (1984). Given the brief nature of this interlude and the undisputed evidence that the Union officials were the ringleaders of the action inside of the store, we find no reason to question the Board's and the ALJ's discretion in its factual findings on this issue. We also find that the cumulative, serious and extensive nature of the pre- and post-certification labor violations supports the Board's finding that these terminations were motivated by anti-union animus. As for Bravo's underemployment, there was also substantial evidence before the Board to support finding that his employment status was motivated by anti-union animus. All four of these employees were active in the Union, and Goya's proffered

18

justification for their terminations and underemployment is weak.[14]

We find that the ALJ's opinion, adopted by the Board's order, is supported by substantial evidence and that Goya perpetrated numerous and extensive labor violations over the months leading up to certification and through the distribution of the disaffection petition. Accordingly we turn to the more difficult issue before us: the appropriateness of one of the Board's chosen remedies in this case, the affirmative bargaining order.

### B. The Affirmative Bargaining Order and Changed Circumstances

Upon finding the numerous labor law violations discussed above, the Board issued, among other remedies, an affirmative bargaining order that would require Goya to bargain with the Union for a reasonable time before a lawful decertification could take place. We have little doubt, given the seriousness of the labor violations before us, had this case not fallen victim to the Board's much delayed process, there would be no concern with regard to the appropriateness of the affirmative bargaining order, as its imposition was subject to the reasoned analysis discussed below. But as a result of an inexplicable five-year delay in this

---

[14] We note, for example, that with respect to salesman Bravo's underemployment, Ms. Unanue was never able to provide a satisfactory explanation for why he was not reinstated at full capacity. Goya is steadfast in its assertion that the rat infestation at its warehouse and in the box Bravo discovered were the result of Union tampering. The Food and Drug Administration, however, found no evidence of tampering and cleared Bravo of wrongdoing. Further, Winn-Dixie's independent inspection of Goya's warehouse uncovered evidence of a rodent problem.

case, we must also address whether the Board had an obligation to consider changed circumstances at the time it rendered its affirmative bargaining order.

1.    The affirmative bargaining order remedy

In order to grapple with the issue at hand, it is important to understand the dynamics of the Board's chosen remedy in this case – an affirmative bargaining order – from both a procedural and remedial perspective.  The Board has available to it an array of remedies to redress unfair labor practices:  "The Board may order the employer, for example, to cease and desist his unfair practices, to post a notice or read one aloud, and to reinstate and reimburse unlawfully discharged employees."[15]  Avecor, Inc. v. NLRB, 931 F.2d 924, 935 (D.C. Cir. 1991).  "A bargaining order is appropriate only where the unfair practices have so intimidated employees that an election, even with the full complement of traditional NLRB

_____

[15] The Board did impose these other remedies in this case, specifically with respect to backpay and reinstatement for the discharged employees, as well as notice posting.  Goya has not challenged the appropriateness of these other ordered remedies, other than to suggest that its own private settlement with the discharged employees moots the Board's ordered remedy.  Goya advances this argument as part of its "changed circumstances" challenge to the Board's ordered remedies in light of significant delay.  The appropriate venue to deal with such changes, including resolution of the employee discharges, is an enforcement proceeding before the Board.  See 29 C.F.R. §§ 102.52, 102.54 (2007); see also NLRB v. Coca-Cola Bottling Co., 55 F.3d 74, 77 (2d Cir. 1995) ("Compliance determinations are made as a matter of course after entry of a Board order directing remedial action, or the entry of a court judgment enforcing such an order, and formal compliance proceedings ensue when necessary to resolve compliance issues.  Thus, compliance proceedings seem analogous to the damages phase of a civil proceeding, or the sentencing phase of a criminal proceedings, and are essentially a continuation of the initial proceeding.") (internal quotations and citations omitted).  We therefore find Goya's argument on this point unpersuasive.

remedies, would not reflect their true sentiments." Id. at 935. A cease and desist order and an affirmative bargaining order essentially serve the same function in the context of an incumbent union, except for the bargaining order's accompanying decertification bar which protects the union from a decertification election for a reasonable time, not more than one year. Caterair Int'l v. NLRB, 22 F.3d 1114, 1121-22 (D.C. Cir. 1994) (discussing differences between these remedies); Sullivan Indus. v. NLRB, 957 F.2d 890, 903 n.5 (D.C. Cir. 1992) ("The decertification bar would last for a 'reasonable period' – at least six months, perhaps as much as one year – during which time the employer and the union would presumably bargain."). As such, an affirmative bargaining order is an "extraordinary" remedy because it infringes on the free association rights of present employees to choose their own representation or no representation. Caterair Int'l, 22 F.3d at 1122. It is both retrospective and prospective in nature. See Gissel Packing Co., 395 U.S. at 612, 89 S. Ct. at 1939 ("[A] bargaining order is designed as much to remedy past election damage as it is to deter future misconduct.").

There are generally two categories of cases from which an affirmative bargaining order may issue: precertification election cases and incumbent union withdrawal cases. The typical affirmative bargaining order case is the former and is exemplified by NLRB v. Gissel Packing Company, 395 U.S. 575, 89 S. Ct. 1918

21

(1969), where the Supreme Court set out a three category test for issuing an affirmative bargaining order when a union claims precertification labor violations caused it to lose an election despite evidence of majority support. See Caterair Int'l, 22 F.3d at 1122-23 (discussing difference between Gissel case and incumbent union case). This case, however, falls into the latter category and is not a Gissel case because here the Union was an incumbent union at the time of withdrawal of recognition. We are presented instead with an unlawful withdrawal of recognition case, where an employer refuses to bargain with an incumbent union and where anti-union animus has sufficiently tainted an otherwise lawful decertification petition. See, e.g., Peoples Gas System, Inc. v. NLRB, 629 F.2d 35, 46 (D.C. Cir. 1980); see also Sullivan Indus., 957 F.2d at 897-98 (successive employer withdrawal of recognition).

The D.C. Circuit, which has seen a disproportionate share of NLRB enforcement actions,[16] requires the Board, prior to issuing an affirmative

_____

[16] The courts of appeals have jurisdiction to enforce a Board's order pursuant to 29 U.S.C. § 160(e). When the Board brings an enforcement action, such as this, venue lies either within the circuit where the unfair labor practice occurred or within any circuit "wherein such person resides or transacts business." 29 U.S.C. § 160(e). When, however, "any person aggrieved" by the Board's order petitions the court of appeals for review of a Board order, that petition may be filed, pursuant to 29 U.S.C. § 160(f), in either the United States Court of Appeals for the District of Columbia or where the unfair labor practices occurred or wherein the person resides or transacts business. Companies who take offensive action against the Board's decision may file in the D.C. Circuit, regardless of whether it would have venue pursuant to 29 U.S.C. § 160(e), and the Board may then file a cross-petition for enforcement of its order. See Int'l Ladies' Garment

22

bargaining order, to justify its remedy in light of the facts of each case. See

Peoples Gas, 629 F.2d at 45-46. In Peoples Gas, the court recognized, for the first

time, the Board's obligation to provide a reasoned explanation for ordering an

affirmative bargaining order: "A remedial order should recognize the competing

considerations which are potentially affected by the remedy chosen, be grounded in

factual determinations rather than speculation, and explain how, in light of present

circumstances its remedy can be expected to effectuate the purposes of the Act."[17]

Id. at 45 (footnote omitted). The Board has begrudgingly adopted the approach

mandated by the D.C. Circuit (and other circuits),[18] and now supports its selection

---

Workers' Union, A.F.L. v. NLRB, 225 F.2d 923, 924 (D.C. Cir. 1955) (consolidating petition for review with enforcement action and harmonizing subsections (e) and (f)).

We note that this case began with the Board's petition for enforcement and that Goya did not file independently for review of the Board's order or for review of the Board's denial of its motion to reopen the proceedings before the Board.

[17] Importantly, we observe that Peoples Gas, which was the first in a line of cases wherein the D.C. Circuit ordered the Board to evaluate more carefully its chosen remedy of an affirmative bargaining order, is itself not a Gissel-type case: "There are two situations in which the dilemma [chance that employees no longer desire union representation] frequently arises; when a Company refuses to accept a Union's offer of authorization cards as evidence of its majority, and then commits unfair labor practices during the election campaign, see NLRB v. Gissel Packing Co., . . . ; and when, as in this case, a Company refuses to bargain with an incumbent Union, asserting a good faith doubt of Union majority support." Peoples Gas, 629 F.2d at 46 (emphasis added; citations and footnotes omitted). Peoples Gas emphasized the analogous relationship between these two types of cases and recognized that circumstances in both types of cases posed a "substantial risk" of frustrating an employee's free association rights. Id. at 46 n.21.

[18] The D.C. Circuit's frustration with the Board over this issue has been the subject of a number of published opinions over the last twenty years. See, e.g., Douglas Foods Corp. v. NLRB, 251 F.3d 1056, 1067 (D.C. Cir. 2001) ("The Board's consistent refusal to fulfill its legal

23

of an affirmative bargaining order remedy with

> a reasoned explanation that will enable the reviewing court to
> determine from the Board's opinion (1) that it gave due consideration
> to the employee's section 7 rights, which are, after all, one of the
> fundamental purposes of the Act, (2) why it concluded that other
> purposes must override the rights of the employees to choose their
> bargaining representatives and (3) why other remedies, less destructive
> of employees' rights, are not adequate.

Charlotte Amphitheater Corp. v. NLRB, 82 F.3d 1074, 1078 (D.C. Cir. 1996); see
also Peoples Gas, 629 F.2d at 46.

Peoples Gas expressly rejected relieving the Board of its obligation to
provide a reasoned justification for imposing a bargaining order in a withdrawal of
recognition case:

> Gissel, of course, involved unfair labor practices committed
> before any election was held, and the balance of interests at that point
> may appropriately place more weight on the employees' free choice. In
> withdrawal of recognition cases, deterrence and industrial stability
> emerge as important considerations. However, the fact that the balance
> may be different depending on the facts of the case does not mean that
> no balance need be drawn.

Peoples Gas, 629 F.2d at 47 n.23; see also Williams Enters., Inc. v. NLRB, 956
F.2d 1226, 1237 (D.C. Cir. 1992) ("The requirement that a bargaining order be

---

obligation to provide sufficient justification for its bargaining orders will not prevent us from
fulfilling our obligation to apply the law. So long as the Board persists on its current course we
have no choice but to remand each offending order."); Charlotte Amphitheater Corp. v. NLRB,
82 F.3d 1074, 1079 (D.C. Cir. 1996) ("We have repeatedly called the Board to task for its
intransigent refusal to accept and act upon our instructions that the appropriateness of a
bargaining order must be assessed as of the time it is issued.").

accompanied by a reasoned explanation applies not only in election cases . . . , but also in cases like Peoples Gas where an employer withdraws recognition from an incumbent union."); Sullivan Indus., 957 F.2d at 903 (refusing to enforce bargaining order in successive employer withdrawal of recognition case where Board failed to give a reasoned analysis).

In Lee Lumber and Building Material Cororation v. NLRB, 117 F.3d 1454, 1460-62 (D.C. Cir. 1997), the D.C. Circuit again specifically rejected applying a different analytical framework to incumbent union withdrawal of recognition cases:

> Gissel, of course, involved a non-incumbent union and as such is not directly implicated here. This court, however, has required the Board to make detailed findings as to why a bargaining order is appropriate not only in cases involving non-incumbent unions, but also in cases involving incumbent unions. . . .
> We have repeatedly held that if the Board wishes to impose an affirmative bargaining order, it must explain why that remedy is appropriate given the facts of that particular case.

Id. at 1461 (emphasis added). Although the relevant considerations may change somewhat in a withdrawal of recognition case, the necessity of an analysis that "explain[s] how, in light of present circumstances its remedy can be expected to effectuate the purposes of the Act" does not change. Peoples Gas, 629 F.2d at 46. The Seventh Circuit has also required the Board to justify its imposition of an affirmative bargaining order, regardless of the type of case in which it is ordered.

25

See Ron Tirapelli Ford, Inc. v. NLRB, 987 F.2d 433, 441 (7th Cir. 1993) ("[T]he Board must follow the dictates of Gissel and its progeny and consider whether less drastic measures would serve the balance of interests. At all times, the Board is charged with accomplishing and articulating this balance of interests against the backdrop of its obligation to craft a remedy for employer misconduct that is remedial rather than punitive.") (emphasis added).[19]

Accordingly, we now follow the D.C. Circuit and other circuits, and hold that in all cases, whether a Gissel-type bargaining case or an unlawful withdrawal of recognition case, the Board must justify its imposition of an affirmative bargaining order by employing a reasoned analysis to justify its chosen remedy. In

---

[19] The Seventh Circuit relied on the D.C. Circuit's opinion in Peoples Gas, where the court specifically recognized that similar considerations inform the propriety of an affirmative bargaining order in both the Gissel and the withdrawal of recognition contexts. Peoples Gas did note, however, that in the withdrawal of recognition context "deterrence and industrial stability emerge as important considerations" among the considerations that should be before the Board. Peoples Gas, 629 F.2d at 47 n.23.

The Fourth Circuit appears also to have required the Board to employ some form of reasoned justification in the incumbent union case. See NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1289 (4th Cir. 1995) (recognizing Board's justification of its chosen remedy in incumbent union/successor employer context). The Fourth Circuit received Williams Enterprises in a second enforcement action, which the D.C. Circuit had remanded back to the Board the first time at least in part to employ a more robust analysis before entry of an affirmative bargaining order. See Williams Enters., Inc. v. NLRB, 956 F.2d 1226, 1238 (D.C. Cir. 1992). On remand, the Board devoted significant space in its order to distinguishing a Gissel case from an incumbent union case and justifying its issuance of an affirmative bargaining order in this latter context. See Williams Enters., Inc., 312 NLRB 937, 940-42 (1993). The Board clearly met its obligation to provide a reasoned analysis for its decision in either context, and thus the Fourth Circuit affirmed the Board's requested remedy.

this case, we are satisfied that the Board adequately analyzed the three prongs of the D.C. Circuit's test.[20]

Central to the Board's findings that supported the issuance of a bargaining order were the ongoing and pervasive nature of the violations, which occurred during the first year of certification, a time in which "unions are usually at their greatest strength." (Board at 6.) The Board specifically rejected a "cease and desist order," which the D.C. Circuit has noted should usually be the appropriate remedy when a certified union is in place. See Caterair Int'l, 22 F.3d at 1123 (noting, in an incumbent union case, that a cease and desist order is a "prime example" of an alternative remedy to those affirmative bargaining orders outlined in Gissel). Here, the Board found that the employees need the protection of a temporary (no more than one year) decertification bar in order "to regroup and bargain through their representative in an effort to reach a collective-bargaining agreement." (Board at 6.) The effect of rampant violations in the first year of union representation underscores the fact that the Union never had an opportunity to bargain with and adequately represent its members:

[Goya] substantially undermined the Union's opportunity to

---

[20] We note that two of the three-member Board (at the time) stated they were in agreement with the analysis required by the D.C. Circuit, despite the Board's own precedent and long-standing reluctance. (Board at 6 n.14.)

27

effectively bargain, without unlawful interference, during the period when unions are usually at their greatest strength. Because the Union was not given a truly fair opportunity to reach an accord with [Goya], it is only by restoring the status quo ante and requiring [Goya] to bargain with the Union for a reasonable period of time that employees will be able to assess for themselves the Union's effectiveness as a bargaining representative.

(Id.)

We observe that this reasoning is entirely consistent with the purpose of the affirmative bargaining order recognized by the Supreme Court in Gissel Packing Co., see 395 U.S. at 612, 89 S. Ct. at 1939, wherein the Court observed that a bargaining order serves as much as a remedy to right past wrongs as it does serve as a deterrent for future misconduct. One aim of a Board remedy should be to return to the status quo ante the unfair labor practices.[21] See NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1289 (4th Cir. 1995) (finding, in the successive employer incumbent union context, that "only an affirmative bargaining order can restore the status quo ante – that is, reseat the union as the incumbent and restore to it the bargaining opportunity it would have had but for the successor's unlawful

_____

[21] In a related context, when a court issues an interim bargaining order, courts have made clear that return to the "status quo" is the appropriate consideration: "Rather than return employees to their status before they contacted the union and began the process of organizing, a district court should restore the status quo as it existed before the onset of unfair labor practices." Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates, 241 F.3d 652, 660 (9th Cir. 2001) (internal quotations and citations omitted) (citing to decisions from Second, First, Sixth, and Seventh Circuits).

28

refusal to bargain"); see also Ron Tirapelli Ford, Inc., 987 F.2d at 445 (finding in an incumbent union context that "a bargaining order is the appropriate remedy to return the parties to the status quo ante"). "In contrast, a non-incumbent union never enjoyed a presumption of majority status; therefore, an affirmative order to bargain with a nonincumbent union grants it a better position than the status quo – initial recognition as the bargaining agent which it would not have had even before the company's unlawful conduct." Williams Enters., Inc., 50 F.3d at 1289.

At oral argument, counsel for Goya acknowledged that the Board was correct to credit in its analysis the fact that the extensive violations that occurred here took place during the Union's first year of certification. Cf. Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 373 (11th Cir. 1992) (recognizing how vulnerable newly certified unions are to management resistance). The Union was deprived of the opportunity to enjoy the irrebuttable presumption of majority status that ordinarily accompanies unions in the first year of certification, and the attendant bargaining strength that comes with it. The unfair labor practices found by the Board began well before the first year of certification. But just because union support was strong enough to overcome Goya's anti-union efforts in order to secure certification, it would be unfair to penalize the Union by returning to the precertification status. Instead, it seems emminently reasonable and consistent with

29

the remedial purpose of the affirmative bargaining order to restore the Union to the position it would have been in were it not for the unfair practices and the misconduct during its first year of certification that deprived the Union both of its year of presumptive support and – given the evident strength of the Union at the time of certification – a meaningful opportunity to bargain for an initial agreement with Goya.

The Board satisfied its burden here: it evaluated each of the required factors in light of the record before it at the time it issued its order. Thus we conclude that the Board adequately justified its imposition of an affirmative bargaining order, which appears from the Board's reasoning to be the appropriate remedy in this case. However, Goya argues that the Board's order, and in particular the affirmative bargaining order, should not be enforced because of the extensive passage of time and changed circumstances (especially employee turnover). We address this argument in the next section.

2.      Passage of time and changed circumstances

Goya argues that the case law requires the Board to justify any affirmative bargaining order by taking into consideration the "present circumstances"[22] existing

---

[22] "Present circumstances" could implicate many aspects of a company's present situation; here, Goya appears to assert that employee turnover, technological changes, private settlement with the discharged employees, and management changes, in addition to the five-year

at the time that the Board issues its order, as opposed to the past circumstances extant at the time of the unfair labor practices. It is true that the circuit courts of appeals are almost unanimous in concluding that such changed circumstances are relevant with respect to the justification for affirmative bargaining orders in pre-certification-<u>Gissel</u> cases.[23] Our own precedent suggests as much. In <u>Piggly Wiggly, Tuscaloosa Division Commodores Point Terminal Corporation v. NLRB</u>, 705 F.2d 1537, 1543 (11th Cir. 1983), we recognized that "[i]n some cases, these factors [passage of time and employee turnover] play a role in determining the contemporary necessity of issuing a bargaining order, particularly if the employees have reason to no longer fear company reprisals and harassment if they vote for the

---

delay, should have been considered by the Board (and this Court) before issuing or enforcing an affirmative bargaining order.

[23] The relevance of changed circumstances, at least in a <u>Gissel</u>-type case, appears to be a settled issue among the courts of appeals. The D.C. Circuit has not been alone in requiring the Board to provide sufficient justification for its bargaining orders based on conditions present at the time it issues its order. <u>See, e.g.</u>, <u>NLRB v. Cell Agric. Mfg. Co.</u>, 41 F.3d 389, 397-98 (8th Cir. 1994) (citing cases from the 1st, 3rd, 4th, 5th, 6th, 7th, and, 11th Circuits, that have all found that conditions at the time of the order are relevant considerations for the issuance of an affirmative bargaining order); <u>J.L.M., Inc. v. NLRB</u>, 31 F.3d 79, 84 (2d Cir. 1994). The Eighth Circuit has said succinctly: "[W]e adopt the view that the Board must consider any change of circumstances, including the passage of time, employee turnover, and voluntary statements of cooperation by company officials, when deciding whether to issue a bargaining order." <u>Cell Agric. Mfg. Co.</u>, 41 F.3d at 398. We note the unqualified language used by the Eighth Circuit here which does not purport to limit its rule exclusively to <u>Gissel</u>-type orders.

The Ninth Circuit is the lone holdout and has refused, as recently as its 2007 decision in <u>East Bay Auto. Council v. NLRB</u>, 483 F.3d 628, 635 (9th Cir. 2007), to consider changed circumstances, employee turnover, or delay to be relevant in any case.

31

union."[24]

Several cases have extended the same rationale, and required consideration of changed circumstances, in the context of withdrawal of recognition from an incumbent union, a context analogous to the instant case. See Peoples Gas, 629 F.2d at 45-46; see also id. at 45, note 18 ("We think it clear that no responsible decision making body can formulate a reasonable remedy without taking into account conditions at the time its order is entered, though there seems to be some dispute among the circuits whether the Board must do so."); see also Ron Tirapelli Ford, Inc. v. NLRB, 987 F.2d 433, 440 (7th Cir. 1993).[25] Because of the peculiar

---

[24] Piggly Wiggly is consistent with authority binding on this Court from the Fifth Circuit. See NLRB v. American Cable, 427 F.2d 446, 448-49 (5th Cir. 1970) (holding that the Board must consider current circumstances when issuing a bargaining order following Gissel).

[25] But see NLRB v. Creative Food Design Ltd., 852 F.2d 1295, 1301 (D.C. Cir. 1988) (holding that the Board did not have an obligation to consider employee turnover in a withdrawal of recognition from an incumbent union case); see also Scepter, Inc. v. NLRB, 280 F.3d 1053, 1057 (D.C. Cir. 2002) ("Outside the traditional Gissel context, the simple fact of employee turnover since [the company's] withdrawal of recognition would not, without more, have been enough to require a different decision by the Board.") (emphasis added). Although our resolution of this case does not require a definitive decision with respect to the relevance of changed circumstances to imposition of an affirmative bargaining order in the context of a withdrawal of recognition from an incumbent union, we see no reason why changed circumstances that offer independent evidence of employee preference should not be relevant in all but the most egregious cases if properly presented by the parties.

Admittedly, a Gissel-type affirmative bargaining order protects slightly different interests than those protected when the Board issues an affirmative bargaining order in a context like that seen in this case, see Peoples Gas, 629 F.2d 35, 47 & n.23, and Williams Enters., Inc., 50 F.3d at 1289-90, but we think this distinction may only address the weight the Board should accord present conditions and significant delay in its analysis and does not address whether that analysis should take place in the first instance.

posture and particular facts of the instant case, we can assume arguendo, but not actually decide, that the passage of time and changed circumstances are relevant when evaluating the justifications for imposing an affirmative bargaining order, whether the context be a pre-certification-Gissel-type case or a case like the instant withdrawal of recognition from an incumbent union.

The peculiar posture of the instant case is as follows. Notwithstanding the extensive delay between the ALJ decision on February 22, 2001, and the Board's decision on August 30, 2006, Goya filed nothing with the Board to indicate that significant changes had occurred during this passage of time. Thus, at the time of the Board's decision challenged by Goya, the record before the Board revealed no changed circumstances. Promptly after receiving the Board's decision, Goya filed a motion for reconsideration and to reopen the record for consideration of certain listed changed circumstances, including employee turnover. In the most peculiar aspect of the posture of this case, Goya's brief on appeal fails to fairly raise a challenge to the Board's denial of its motion for reconsideration. Neither the motion nor the Board's denial thereof are mentioned in Part A of Goya's brief, entitled "Course of Proceedings and Disposition in the Lower Tribunal." The Statement of Issues does not mention the motion or the order denying same. No heading in the argument section of its brief mentions the motion or the order

33

denying same.  Nor does the summary of the argument.  In the part of the brief in which the motion and order denying same would appropriately have been challenged – i.e., Point IV entitled "Circumstances have Changed so Radically During the More than Six Years Since the Administrative Trial that the Decision Should Not be Enforced, or Should at Most be Remanded" – the motion and the order denying same is mentioned only in a single sentence.  That sentence reads: "Such a motion was made in this case and denied by the Board, but not on timeliness grounds."   That single sentence did not undertake to challenge the Board's rationale in denying the motion.  In order to establish that the Board erred in denying a motion for reconsideration, Goya would have had to argue, inter alia, that its motion was justified by "extraordinary circumstances," and that its motion to reopen the record was based upon additional evidence, with an explanation of "why it was not presented previously."[26]  No such arguments were made in Goya's

---

[26] The Board's regulation permitting a post-order motion to reopen the record reads:

A party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration, rehearing, or reopening of the record after the Board decision or order.  A motion for reconsideration shall state with particularity the material error claimed and with respect to any finding of material fact shall specify the page of the record relied on.  A motion for rehearing shall specify the error alleged to require a hearing de novo and the prejudice to the movant alleged to result from such error.  A motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result.  Only newly discovered evidence, evidence which has become available only since the close of the hearing, or evidence which the Board believes

brief on appeal.

Of course, it is true that we could construe Goya's brief with liberality. We would have discretion to construe its argument about changed circumstances as raising the challenge it never mentions – i.e., that the Board abused its discretion in concluding that the motion failed to present extraordinary circumstances warranting reconsideration and reopening of the record. The issue before us is whether we should invoke our well established law that issues not fairly presented to us are deemed abandoned, or whether we should exercise our discretion in the interests of justice to overlook Goya's deficiency. For the reasons that follow, we decline to exercise our discretion to excuse Goya's deficiencies.

First, to do otherwise would require that we write an opinion without adequate briefing. Neither brief focuses on the rationale of the Board's order denying the motion. Neither brief focuses on the concept of extraordinary circumstances. Neither brief focuses upon the significance of Goya's failure to present to the Board evidence of changed circumstances during the five-year period that the matter was pending before the Board's decision on August 30, 2006.

Second, even if we excuse Goya, and even if we conclude that the Board

should have been taken at the hearing will be taken at any further hearing.

29 C.F.R. § 102.48(d)(1) (2007).

35

abused its discretion in denying the motion to reconsider and reopen the record, the most favorable possible result for Goya would be a remand to the Board. There are at least two issues which we would want to be addressed in the first instance by the Board. The first such issue is whether Goya's motion satisfies the high threshold of "extraordinary circumstances" required by the regulation.[27] The second issue on which we would want the benefit of the considered judgment of the Board involves whether or not Goya should be excused for having waited in silence for the five years between the issuance of the ALJ decision and the Board decision. Goya's motion acknowledged that "[t]he changes described have accumulated in an incremental fashion over the entire intervening period of time." The Board might have a legitimate question as to why Goya should not have been responsible for

---

[27] Because Goya failed to fairly raise a challenge to the Board's denial of its motion to reconsider, we need not in this case remand to obtain the Board's views with respect to the dimensions of the "extraordinary circumstances" requirement which a motion for reconsideration under Regulation § 102.48(d)(1) must satisfy. In making any such determination, the Board's own expertise with respect to the practicalities of its decision-making process would of course be highly important. For example, if the threshold is too low, parties might tend to remain silent in the face of changing circumstances until the Board rules, and then file a motion for reconsideration, seeking a reopening of the record to consider changed circumstances. That of course would impose burdens upon the agency in the form of increasing numbers of rehearings in which records would be reopened and evidence of changed circumstances considered. Obvious increases in agency caseload would result. The extent to which responsibility should be placed upon a party seeking consideration of changed circumstances to present same to the Board before the Board's ruling is a matter which, in our judgment, is best considered in the first instance by the Board in the light of its expertise with respect to its own decision-making process. Thus, the Board's interpretation of its regulation – "why it [the changed circumstances evidence] was not presented previously" – is clearly a matter upon which the Board should rule in the first instance.

evaluating the changes as they occurred, and moving the Board to reopen the record at such time as Goya, in its judgment, deemed the changes of such significance to influence the Board's decision.  In this regard, the Board's interpretation of its own regulation, 29 C.F.R. § 102.48(b),[28] would be instructive.  The Fifth Circuit in NLRB v. U.S.A. Polymer Corp., 272 F.3d 289, 295 (5th Cir. 2001), construed this regulation to give the Board discretion to entertain a motion to reopen the record prior to the Board's decision.  However, the D.C. Circuit has suggested otherwise.  See Cogburn Health Center, Inc. v. NLRB, 437 F.3d 1266, 1272 (D.C. Cir. 2006).  The Board's interpretation of its own regulation would of course be accorded appropriate deference.  See Federal Exp. Corp. v. Holowecki, __ U.S. __, 128 S. Ct. 1147, 1155 (2008) ("Just as we defer to an agency's reasonable interpretations of the statute when it issues regulations in the first instance, . . . the agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force."); Allentown Mack Sales &

---

[28] Section 102.48(b) states:

Upon the filing of timely and proper exceptions, and any cross-exceptions, or answering briefs, as provided in §102.46, the Board may decide the matter forthwith upon the record, or after oral argument, or may reopen the record and receive further evidence before a member of the Board or other Board agent or agency, or may make other disposition of the case.

29 C.F.R. § 102.48(b) (2007) (emphasis added).  See also 29 C.F.R. § 102.47 (setting forth the general procedure whereby parties might make a motion to the Board).

Service, Inc., 522 U.S. at 377, 118 S. Ct. at 828 ("Substantive review of an agency's interpretation of its regulations is governed only by that general provision of the Administrative Procedure Act which requires courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' . . . . It falls well within this text to give the agency the benefit of the doubt as to the meaning of its regulation."); see also Piggly Wiggly, 705 F.2d at 1539 ("It is for the Board to regulate its own procedures and interpret its own rules, so long as it does not act unfairly or in an arbitrary and discriminatory manner."). Thus, even if we excused Goya's deficiency in failing to challenge the Board's denial of its motion for reconsideration and reopening of the record, it would merely result in a further prolongation of this case which is already embarrassingly old.

A final, and significant, reason that we decline to overlook Goya's failure to challenge the denial of its motion is as follows. The instant case involves what we consider to be egregious and pervasive unfair labor practices on the part of Goya. These unfair labor practices included, inter alia: Goya fired three employees and suspended one out of anti-union animus; Goya conducted numerous coercive interrogations of employees; Goya management made numerous coercive threats, for example to deny union members pension benefits, to close the facility, etc.

38

Most significantly, Goya management repeatedly told numerous employees that it would never recognize or bargain with the union. Then, even after certification of the union, Goya refused to recognize union representatives, instituted numerous unilateral changes (without giving the union an opportunity to bargain thereon), and management repeatedly threatened job loss if union protests like the one at the Winn-Dixie store continued. Goya repeatedly made changes to its policies – policies that were the "'bread and butter' issues that lead employees to seek union representation" – without consulting the Union. (Board at 5.) The ALJ observed that the Union "was ignored and [Goya] continued to operate its business as if the employees were not represented by the Union." (ALJ at 21.) In other words, Goya followed through on its threat that it would never recognize the union. As the ALJ found, the net effect "was to reverse the outcome of the election by ignoring the union." (ALJ at 20-21.) The Board, adopting the ALJ's opinion, found the labor violations at issue in the instant case "highly coercive." (Board at 4.) According to the Board, Goya engaged in a "widespread and unrelenting pattern of unlawful conduct [that] continued from the beginning until the end of the certification year." (Board at 4.) In sum, the egregious nature of the unfair labor practices and the clear record of strong anti-union animus revealed by this record strongly militates against using our discretion to overlook Goya's waiver. Moreover, there is nothing

in the instant record, or in Goya's motion for reconsideration, to indicate that the employees might prefer non-union status or representation by another union. To the contrary, the union won the election by considerable margins, and there is overwhelming evidence to support the ALJ's finding that the disaffection petition was caused by Goya's unfair labor practices. Additionally, the ALJ noted that a petition of support was signed by a majority of the warehouse employees one month after the disaffection. (ALJ at 23.)

Having decided that the interests of justice do not support the exercise of our discretion to overlook Goya's waiver, the instant case is left in the following, very peculiar posture. In this posture, Goya's argument is in effect reduced to an argument that we should decline to enforce the Board's order merely because of the passage of time. In other words, on August 30, 2006, when the Board issued its order, there was no evidence before the Board with respect to changed circumstances. Thus, Goya's argument reduces to a proposition that the Board, after some unspecified period of delay, should be required to sua sponte reopen the record for the receipt of evidence of changed circumstances. Goya cites no case which has imposed such a sua sponte duty, nor has our research revealed any such case. Indeed, in a context somewhat similar to the peculiar context of the instant case, the Fifth Circuit in NLRB v. U.S.A. Polymer Corp., has rejected the notion of

40

any such <u>sua sponte</u> duty.  The Fifth Circuit held:

> It is not the Board's responsibility to continually update the factual picture that the parties have provided.  While the Board must consider properly presented or tendered evidence of materially changed relevant circumstances in bargaining order cases, we can see no reason why the Board itself should be required to gather evidence.  The party that seeks to benefit from demonstrating a change of circumstances bears the burden of timely providing the Board with evidence of these changes.  The Board is entitled to assume, in the face of the parties' silence, that the facts as initially presented continue to adequately describe the employer's work force.

<u>U.S.A. Polymer Corp.</u>, 272 F.3d at 296.

We agree with the Fifth Circuit.  It is self-evidently feasible to place the responsibility of providing the Board with evidence of changed circumstances upon the party privy to such changes.  This party not only is the party seeking to benefit from the changes, but also is the only entity in a position to evaluate the changes as they occur and move the Board to reopen the record at such time as the party in its judgment deems the changes of such significance as to influence the Board's decision.  While the Fifth Circuit's placement of this responsibility is self-evidently feasible, imposition of a <u>sua sponte</u> duty on the Board to gather evidence or reopen the record at some unspecified time is of doubtful feasibility.[29]  Certainly Goya has

---

[29] It does not seem feasible to set any particular period of delay as a trigger to invoke any such <u>sua sponte</u> action on the part of the Board to solicit evidence of changed circumstances.  The significance of changed circumstances will vary with the seriousness of the unfair labor practices in a particular case and the extent to which the effect thereof might linger as coercive forces impeding a future election.  In other words, the relevance of Board delay will not

not suggested how such a <u>sua sponte</u> duty might feasibly dovetail with agency

decision making.  In any event, in light of the egregious nature of the unfair labor

practices and anti-union animus revealed by this record, and the lack of any

evidence that the anti-union animus might have abated or that the pro-union

sentiments of the employees might have changed,[30] we decline to impose upon the

Board a <u>sua sponte</u> duty in this particular case.

## V.  CONCLUSION

For the foregoing reasons, we conclude that the findings of fact by the ALJ

and the Board are unassailable.  Because the ALJ and the Board considered all of

the relevant evidence in the record at the time of the Board's August 30, 2006,

order, and because the Board's decision amply justified all of its findings,

---

necessarily be coextensive with the relevance of changed circumstances in a particular case.

[30] We also take judicial notice of subsequent proceedings before the Board involving these same parties in ongoing labor disputes arising out of Goya's unlawful withdrawal of recognition from the Union that we have reviewed here.  See Carter v. Am. Tel. & Tel. Co., 365 F.2d 486, 491 (5th Cir. 1966) (recognizing that district court could take judicial notice of "agency order").  Since its August 30, 2006, order in this case, the Board has also decided <u>Goya Foods of Fla. & UNITE HERE, CLC</u>, 351 NLRB No. 13, 2007 WL 2858938 (N.L.R.B. Sept. 28, 2007) and <u>Goya Foods of Fla. & UNITE HERE, CLC</u>, 350 NLRB No. 74, 2007 WL 2425569 (N.L.R.B. Aug. 23, 2007).  Additionally, as recently as January of this year, Goya was involved in another matter before the Board arising out of this case, see <u>Goya Foods of Fla. & UNITE HERE, CLC</u>, No. S 12-CA-23524, 2008 WL 220198 (N.L.R.B. Div. of Judges Jan. 23, 2008).  This latter action involves purported unilateral changes occurring as recently as November of 2006 – after the Board issued its affirmative bargaining order in this case.  There, the ALJ found that Goya made unilateral changes to its pension plan policy, which Goya admitted before the ALJ excluded union employees.

including its finding that the affirmative bargaining order was an appropriate remedy, we reject Goya's challenge to the enforcement of that decision. Because Goya did not in its brief on appeal fairly raise a challenge to the Board's denial of its motion for reconsideration, and for the reasons discussed above, we decline to address the Board's denial of Goya's motion for reconsideration. Finally, in the peculiar posture and the particular circumstances of this case, we decline to impose upon the Board a <u>sua sponte</u> duty to reopen the record merely because of the passage of time.

Accordingly, the Board's August 30, 2006, order is due to be

**ENFORCED.**