[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 18-11931, 18-14163
_____

Agency Nos. 12-CA-176715, 12-CA-221114

ADVANCED MASONRY ASSOCIATES, LLC,

Petitioner-Cross Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner.

_____

Petitions for Review of Decisions of the
National Labor Relations Board
_____

(August 16, 2019)

Before MARTIN, ROSENBAUM, Circuit Judges, and MARTINEZ,* District
Judge:

_____

* Honorable Jose E. Martinez, United States District Judge for the Southern District of
Florida, sitting by designation.

MARTIN, Circuit Judge:

Before us are petitions filed by Advanced Masonry Associates, LLC ("Advanced Masonry") seeking review of two Decisions and Orders of the National Labor Relations Board ("the Board"). Advanced Masonry challenges the Board's findings that in the days before a union election it: (1) threatened or implied that employees' wages would decrease if they voted to be represented by the Union; and (2) discharged employees Luis Acevedo and Walter Stevenson because of Acevedo's Union activities, in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act ("the NLRA"), 29 U.S.C. §§ 151 et seq. Advanced Masonry also challenges the Board's finding that it more strictly enforced its safety policies against Mr. Acevedo and Mr. Stevenson because of union activities, in violation of Sections 8(a)(1) and (3) of the NLRA. Finally, Advanced Masonry challenges the Board's ruling that Mr. Acevedo, Mr. Stevenson, and others were eligible to vote in the union election, and that it violated Sections 8(a)(1) and (5) of the NLRA by refusing to recognize and bargain with the Union.

The Board filed cross-applications for enforcement of its Orders. Because the Board's findings are supported by substantial evidence, we deny Advanced Masonry's petitions for review and grant the Board's cross-applications for enforcement.

2

## I.

Advanced Masonry performs bricklaying and masonry on commercial building sites in central and southwest Florida.  The company had a bargaining relationship with the Bricklayers and Allied Craftworkers, Local 8 Southeast ("the Union") under Section 8(f) of the NLRA until the agreement expired on April 30, 2016.  The day before the agreement expired, the Union filed a petition seeking to be certified as the exclusive collective bargaining representative of Advanced Masonry's employees under Section 9(a) of the NLRA.  Under Section 9(a), a union must get the support of "the majority of the employees in a unit" before an employer has to recognize it as the employees' representative.  29 U.S.C. § 159(a). After the Union filed its petition, Advanced Masonry actively campaigned against the Union while the Union, in turn, rallied employees in support.  The mail-in election took place from May 25, 2016 through June 9, 2016, and an initial tally showed 16 votes for the Union and 16 votes against the Union.  Twenty-two other ballots were challenged.

Before the election results were in, the Union filed charges with the Board claiming Advanced Masonry engaged in unfair labor practices in violation of the NLRA in the lead up to the election.  Chief among the Union's complaints was that Advanced Masonry violated Section 8(a)(3) of the Act by firing Mr. Acevedo and Mr. Stevenson based on Acevedo's union support.  Section 8(a)(3) prohibits an

3

employer from discriminating against employees based on union activities. 29 U.S.C. § 158(a)(3). Advanced Masonry said it discharged Mr. Acevedo and Mr. Stevenson because they violated a company safety policy. The Union countered by asserting that the company enforced the policy more strictly in a way that discriminated against Mr. Acevedo and Mr. Stevenson based on Acevedo's union activities. Additionally, the Union charged that in late April or early May 2016, Advanced Masonry threatened employees with lower wages if they voted for the Union. If this happened, it constituted a violation of Section 8(a)(1) of the NLRA. Section 8(a)(1) prohibits employers from interfering with protected union activities. 29 U.S.C. § 158(a)(1).

After the election, the Union and Advanced Masonry were at odds about whether to count 14 challenged ballots, all marked in favor of the Union.[1] Among the 14 challenged ballots were the pro-Union votes submitted by Mr. Acevedo and Mr. Stevenson. Advanced Masonry argued Mr. Acevedo and Mr. Stevenson were ineligible to vote because they had been discharged for cause.

Following a hearing, an Administrative Law Judge ("ALJ") found that Advanced Masonry violated Section 8(a)(1) of the NLRA by threatening that the

---

[1] The parties initially contested 22 total ballots, however, they came to stipulate that 8 of those contested ballots were submitted by ineligible voters. This left disagreement on fourteen ballots.

company would reduce wages if employees chose to be represented by the Union. The ALJ identified two incidents in support of this finding.

The first incident happened in the beginning of May 2016. Richard Karp, one of the owners of Advanced Masonry, spoke with eight masons at a jobsite. The group of masons included Mr. Acevedo. Aleksei Feliz, Advanced Masonry's Safety Director, translated Mr. Karp's message into Spanish. Mr. Karp told the masons they were going to receive a ballot and that the company wanted them to vote in the election. When asked whether wages would go down if the employees decided not to unionize, Mr. Karp told the masons their wages are decided by the market. But that same day, Mr. Feliz followed up on Mr. Karp's remarks, telling a group of masons to vote against the Union because it was "taking [their] money." He said voting for the Union would cause their rates to drop from $22 per hour to $18-and-some-change per hour. Mr. Acevedo, a Union supporter, told the other masons Mr. Feliz's claims were untrue, and in response, Mr. Feliz glared at Mr. Acevedo "like he was mad." Mr. Feliz denied speaking about wages, but the ALJ expressly credited Mr. Acevedo's version of this incident.

The second incident cited by the ALJ happened on May 16, 2016, at a construction jobsite. Brent McNett, an Advanced Masonry foreman, mentioned the upcoming union election. He then told a group of masons the Union "probably wo[uld]n't be good for wages." The ALJ based his findings about this incident on

5

testimony by Mr. Stevenson and Mr. McNett.  The ALJ found Mr. Feliz's

statement "str[uck] to the heart of [the] mason's livelihood" and Mr. McNett's

statement "sent a clear message to employees that the Company would reduce

wages if the employees selected the Union."

Aside from the finding regarding threats to employees' wages, the ALJ also

found Advanced Masonry violated Section 8(a)(3) of the NLRA by suspending and

firing Mr. Acevedo and Mr. Stevenson in retaliation for Acevedo's union support

and in an effort to restrain them from voting for the Union.[2]  At the time they were

terminated, Mr. Acevedo and Mr. Stevenson were working at a jobsite at the

University of Tampa (the "Tampa site").  On May 16, 2016, they attended a safety

meeting led by the site's general contractor followed by a "Toolbox Talk" led by

Foremen Brent McNett and Mario Morales.  After the Toolbox Talk, Mr. McNett

reminded the employees they would be working inside a building at an elevation of

more than six feet and they would need to "tie off."

The instruction to "tie off" was intended to cue the masons to follow

Advanced Masonry's fall-protection policies.  The company's general safety

policies provide that masons must "[w]ear a full body harness with a shock-

---

[2] The ALJ observed—and Advanced Masonry does not appear to challenge—Mr. Acevedo was a known Union supporter.  There was evidence showing Mr. Acevedo's Union support, including descriptions of moments in which Mr. Acevedo met with a Union representative, helped explain the benefits of joining the Union to non-member masons, and took shirts offered by a Union representative.

absorbing lanyard or retractor in all elevated areas not protected by guardrails." Masons are instructed they should "[n]ever connect two lanyards or a retractor and a lanyard to each other." The fall-protection program materials explain the "requirements for fall protection start at a 6 [foot] elevation," and there are "[n]o exceptions."[3] Advanced Masonry's employee handbook underscores the need to use appropriate safety equipment and says an employee may be terminated for a safety violation. Other materials describe Advanced Masonry as having "zero tolerance" for fall-protection violations.

After the masons began working, Mr. Morales toured the Tampa jobsite. He noticed Mr. Acevedo and Mr. Stevenson were working on a scaffold at an elevation higher than 6 feet, but neither was wearing the appropriate safety gear. Mr. Morales asked Mr. Acevedo and Mr. Stevenson whether they had heard Mr. McNett's instruction to tie off when exposed to falls over six feet. Mr. Acevedo responded that he had not tied off at higher elevations when the team laid bricks outside the building and said he would not fall. But Mr. Morales explained the fall-protection policy required them to tie off for their present task inside the building. He instructed them to descend from the scaffold and retrieve their harnesses. The two masons complied. Afterward, Mr. Morales called Mr. McNett

---

[3] Advanced Masonry's fall-protection policy is stricter than that of the Occupational Safety and Health Administration, which mandates fall protection starting at an elevation of 10 feet. See 29 C.F.R. § 1926.451(g)(1).

to inform him that two masons had been working without using proper fall protection. Mr. McNett asked who violated the rules, and Mr. Morales reported it was Mr. Acevedo and Mr. Stevenson.

Later that morning, Mr. McNett was walking through the Tampa site when he observed Mr. Acevedo and Mr. Stevenson working on the scaffold at an elevation of more than six feet. They were wearing harnesses, but they had tied off improperly. Mr. McNett admonished the men and showed them the right way to tie off to the scaffold. In response, Mr. Acevedo and Mr. Stevenson claimed they had never been trained on how to properly tie off. Knowing both men had worked at another Advanced Masonry site where they worked at a high elevation, Mr. McNett doubted these claims.

Mr. McNett called Mr. Feliz and told him two masons who previously worked at the Westside Yacht Club jobsite said they had not been trained on how to tie off and use harnesses. Mr. Feliz said all the masons from the Westshore jobsite received fall-protection training. Mr. Feliz said he would contact Fernando Ramirez, the company's Safety Coordinator, to see if the masons had signed an attendance sheet indicating they were present for a safety training at their previous jobsite. Later that afternoon, Mr. Ramirez arrived at the Tampa site with an attendance log showing Mr. Acevedo and Mr. Stevenson both attended safety training at their last jobsite. During that training, which Mr. Ramirez led, masons

8

were instructed on the company's fall-protection policies.  During a conversation with Mr. Ramirez, Mr. Acevedo and Mr. Stevenson recalled they had received fall-protection training.

After Mr. Ramirez reported his findings, Mr. Feliz instructed him to prepare an incident report, or "Employee Warning Notice."  On the notices, Mr. Ramirez indicated Mr. Stevenson and Mr. Acevedo had violated safety and company policies by working at an elevation of ten feet without properly tying off.  Ramirez labelled the incident as a level "1," which was the least serious offense on a scale that also included "2," "3," and "final."  And in a row featuring possible "action[s] to be taken," Mr. Ramirez checked "suspension," as opposed to "warning," "probation," or "dismissal."  He also wrote on the forms "sent home for remainder of day."

Mr. Ramirez and Mr. McNett found Mr. Acevedo and gave him his warning. During their discussion, Mr. McNett accused Mr. Acevedo of lying about not having received fall-protection safety training.  Shortly after, Mr. McNett told Mr. Acevedo and Mr. Stevenson the decision to send them home was "not in [his] hands" and they were "in review."  Mr. Acevedo and Mr. Stevenson signed their warnings—the first and only discipline each had received while working for Advanced Masonry—and left the site.

9

Later that day, Mr. Feliz considered whether to discharge Mr. Acevedo and Mr. Stevenson. In reviewing the warnings and other paperwork, he recalled that Mr. Acevedo was a Union member and grew concerned about whether senior management would take issue with terminating the masons just weeks before the union election. This prompted Mr. Feliz to call Mr. Karp to discuss the matter. After the conversation, the decision was made to terminate Mr. Acevedo and Mr. Stevenson.

The next morning, Mr. McNett informed Mr. Acevedo that he and Mr. Stevenson were being fired for violating the fall-protection rule. Mr. Acevedo asked whether this was because he is "a union guy," and Mr. McNett responded, "this is America; fight for your rights."[4] Mr. Acevedo then left and called Mr. Stevenson to give him the news. The next day, Mr. Acevedo and Mr. Stevenson each called Mr. Feliz. Mr. Acevedo asked if he could be laid off instead of terminated, to which Mr. Feliz responded "no." Mr. Stevenson told Mr. Feliz, "[w]e were wrong," and asked for "another chance down the road."

The ALJ examined Advanced Masonry's written "zero tolerance" policy, and found that despite having this written policy, the evidence showed the company had not discharged other employees for their first offense of failing to

---

[4] Mr. McNett denied making the statement, but the ALJ credited the testimony of Mr. Acevedo over that of Mr. McNett.

properly tie off.  The ALJ compared the treatment of Mr. Acevedo and Mr. Stevenson to the treatment of other masons and observed the "safety policy was not zero tolerance, but rather, a tolerance of up to one or two fall protection violations."  To the ALJ, "[t]he evidence of disparate treatment, combined with the timing of the suspensions and discharges shortly after Acevedo challenged Feliz about the merits of union representation during the peak of the pre-election period, provide[d] a causal connection between  [Advanced Masonry's] antiunion animus and the decision to selectively enforce its fall protection policy and discharge Acevedo and Stevenson."  Also "suspicious" to the ALJ was Mr. Feliz's "unusual step of discussing the incident with [Mr.] Karp[]."  The ALJ found Mr. Acevedo and Mr. Stevenson would not have been suspended then discharged if not for Acevedo's protected Union activities.  Despite making these findings, the ALJ found no violation of the NLRA based on Advanced Masonry's stricter enforcement of its fall-protection policy.[5]

In addition to these findings, the ALJ found, of the fourteen challenged ballots, Advanced Masonry had not met its burden of proving Mr. Acevedo, Mr. Stevenson, and eight other masons were ineligible to vote in the union election.

---

[5] The ALJ dismissed the stricter-enforcement allegation because he was "not convinced that [Advanced Masonry] resumed enforcement of the fall-protection policy solely because of the impending . . . election or for the purpose of trapping Acevedo and Stevenson in a violation and because the policy was mandated by law."  See Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip. op. at 4 (Apr. 13, 2018) (quotation marks omitted and alterations adopted).  The Board found that the ALJ erred in both respects.  Id.

11

Consequently, the ALJ determined those ten challenged votes—all in support of the Union—should be counted.

The Board's Order and Decision affirmed the ALJ's finding that Advanced Masonry violated Sections 8(a)(1) and (3) of the NLRA by (1) suspending and discharging Mr. Acevedo and Mr. Stevenson for Acevedo's union support and (2) threatening that employees' wages would decrease if they selected the Union.[6] Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 7 (Apr. 13, 2018). The Board, however, disagreed with the ALJ's assessment of Advanced Masonry's enforcement of its fall-protection policy. See id. The Board found Advanced Masonry violated Sections 8(a)(1) and (3) of the NLRA by more strictly enforcing its fall-protection policy against Mr. Acevedo and Mr. Stevenson because of their union activity. Id.

As for the challenged ballots, the Board agreed with the ALJ's finding that votes submitted by Mr. Acevedo, Mr. Stevenson, and seven others should be counted in the union election.[7] Id. The Board ordered Advanced Masonry to,

---

[6] The Board relied only on Mr. Feliz's threats of reduced wages to make its determination. Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip. op. at 1, n.3. Because the Board concluded such a finding would be "cumulative and would not materially affect the remedy," it did not address the ALJ's additional finding that Advanced Masonry violated Section 8(a)(1) when Mr. McNett stated that it would not be good for wages if the Union won the election. Id.

[7] The Board, however, found that one of the challenged votes that the ALJ would have counted was submitted by an ineligible voter. Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 6. As a result, the Board disagreed with the ALJ's assessment that ten votes should be counted. Rather, it determined that nine votes should be counted in the election.

12

among other things, offer to reinstate Mr. Acevedo and Mr. Stevenson and to make them whole for lost earnings and benefits.  Id. at 9.  The Board also ordered Advanced Masonry to cease violating the NLRA and to count the nine previously challenged ballots.  Id. at 8–9.

In April 2018, the nine ballots were counted in the election, leading to a revised tally of 25 votes to 16 votes in favor of the Union.  On May 8, 2018, the Board certified the Union as the employees' collective-bargaining representative. But when the Union sought to bargain on behalf of the masons, Advanced Masonry refused in order to create a technical violation of the NLRA.  The violation allowed Advanced Masonry to challenge the Board's ballot-eligibility decisions with this Court.  See 29 U.S.C. § 160(f).  In June 2018, the Board's General Counsel filed an administrative complaint about Advanced Masonry's refusal to bargain with the Union.  The General Counsel then moved for summary judgment, which the Board granted by a Decision and Order issued on August 17, 2018.  In its Order, the Board determined that, by refusing to recognize and bargain with the Union, Advanced Masonry had engaged in unfair labor practices, in violation of Sections 8(a)(1) and (5) of the NLRA.  See Advanced Masonry Assocs., LLC, 366 NLRB No. 164 (Aug. 17, 2018).

Advanced Masonry filed separate petitions for review, challenging both of the Board's Decisions and Orders.  In response, the Board filed applications to

13

enforce its orders.  We now consider Advanced Masonry's petitions and the Board's applications for enforcement.

## II.

This Court reviews the Board's factual findings to ensure they are supported by substantial evidence based on the record as a whole.  29 U.S.C. § 160(e).  Under the substantial evidence standard, the record must contain "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  NLRB v. Allied Med. Transp., Inc., 805 F.3d 1000, 1005 (11th Cir. 2015) (quotation marks omitted).  "Provided any inferences drawn from the record were plausible, this Court may not overturn the Board's determination even if it would make a different finding under a de novo review."  NLRB v. Contemporary Cars, Inc., 667 F.3d 1364, 1370 (11th Cir. 2012).  Likewise, "we are ordinarily bound by an ALJ's credibility determinations" unless they are "inherently unreasonable or self-contradictory" or "based on an inadequate reason, or no reason at all."  NLRB v. Goya Foods of Fla., 525 F.3d 1117, 1126 (11th Cir. 2008) (quotation marks omitted).  Under this "exceedingly narrow standard of review," we will not disturb the Board's decision unless it has exercised its discretion "in an arbitrary and capricious manner."  Contemporary Cars, Inc., 667 F.3d at 1370 (quotation marks omitted).

## III.

Advanced Masonry challenges the Board's finding that it threatened wages would be lower if employees elected to be represented by the Union. Advanced Masonry also says the Board's findings that it unlawfully discharged Mr. Acevedo and Mr. Stevenson in retaliation for Acevedo's Union activities and more strictly enforced its fall-protection rule against these employees are not supported by substantial evidence. Our review leads us to conclude that the Board's findings are supported by substantial record evidence. Thus, we also affirm the Board's finding that Mr. Acevedo and Mr. Stevenson were eligible to vote in the Union election. In light of Mr. Acevedo's and Mr. Stevenson's determinative votes in favor of the Union,[8] we conclude substantial evidence supported the Board's finding that Advanced Masonry violated Sections 8(a)(1) and (5) of the NLRA when it refused to bargain with its employees' chosen representative.

### A.

Advanced Masonry argues substantial evidence does not support the Board's findings that Mr. Feliz and Mr. McNett made statements threatening that employees' wages would fall if they elected to be represented by the Union.

---

[8] Because Mr. Acevedo's and Mr. Stevenson's votes solidify the outcome of the Union election, we need not consider Advanced Masonry's arguments about the other seven challenged ballots.

Specifically as to the statements the Board found Mr. Feliz made, Advanced Masonry complains that the Board's finding stemmed "entirely from the testimony of Acevedo," noting Feliz denied issuing a warning about wages.  Yet Advanced Masonry concedes that the ALJ expressly credited Mr. Acevedo's testimony on this point and that the Board adopted the ALJ's credibility determinations.  Advanced Masonry argues we do not need to defer to the ALJ's credibility determination because it was inherently unreasonable to credit Mr. Acevedo's testimony.  In support of this argument, Advanced Masonry notes that Mr. Feliz translated Mr. Karp's statement that the market set wages, observes that nothing in the record indicated Feliz showed any personal anti-Union animus, and points to evidence that arguably supports its contention that Feliz did not threaten wages.  Nevertheless, Advanced Masonry has not identified anything in the record meeting the high mark of establishing that the ALJ's, and thus the Board's, credibility determinations were self-contradictory, inherently unreasonable, or based on inadequate reasons.  See Goya Foods of Fla., 525 F.3d at 1126; see also Raymond Interior Sys., Inc. v. NLRB, 812 F.3d 168, 178 (D.C. Cir. 2016) ("The existence of potential inconsistencies in credited testimony, without more, is not sufficient for the court to overturn an ALJ's credibility finding.").

On this record, we also decline to disrupt the Board's finding that Mr. McNett made a statement threatening reduced wages.  Advanced Masonry says

16

allegations about Mr. McNett "came exclusively from [Mr.] Stevenson," Stevenson had only a limited memory of his discussion with McNett, McNett "denied making the statement attributed to him," and McNett was a dues-paying member of the Union at the time he made the alleged statement. But we cannot say the Board committed any error in deciding to credit Mr. Stevenson's testimony over testimony by Mr. McNett. See Goya Foods of Fla., 525 F.3d at 1126; Raymond Interior Sys., Inc., 812 F.3d at 178. To the contrary, we conclude substantial evidence supports the Board's findings and affirm the Board's ruling that Advanced Masonry violated Section 8(a)(1) of the NLRA by threatening reduced wages if employees selected the Union.

## B.

Advanced Masonry also argues the Board erred in finding it violated Sections 8(a)(1) and (3) of the NLRA when it suspended and discharged Mr. Acevedo and Mr. Stevenson because of Acevedo's Union activities. Under the framework established in Wright Line, 251 NLRB 1083 (1980), enforced 662 F.2d 899 (1st Cir. 1981), the Board's General Counsel is required to "make a prima facie showing sufficient to support the inference that protected conduct was a motivating factor in the employer's decision" to take adverse action. Wright Line, 251 NLRB at 1089 (quotation marks omitted). If the General Counsel makes this initial showing, then the burden shifts to the company to rebut the inference. Id.

17

The employer may do so by showing, by a preponderance of the evidence, that it would have taken the same action even absent the employee's protected conduct. Id.

### 1.

The Board found the Union established that Mr. Acevedo's protected activity was a motivating factor for the discharges. In so finding, the Board first noted that Advanced Masonry conceded knowledge of Mr. Acevedo's union activity and support. The Board also chiefly relied on (1) the close timing of the election and the discharge decisions, (2) Advanced Masonry's nearly concurrent threats that wages would fall if the Union won the election, and (3) Advanced Masonry's disparate treatment of Acevedo and Stevenson as compared to other employees who violated the company's fall-protection policy. See Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 3. Advanced Masonry argues the evidence before the Board did not establish Mr. Acevedo's Union activities were a factor motivating the discharges.

"Motive is a question of fact, and the Board may rely upon direct and circumstantial evidence to infer anti-union motive." NLRB v. McClain of Ga., Inc., 138 F.3d 1418, 1424 (11th Cir. 1998).

> Factors which may support an inference of anti-union motivation include an employer's expressed hostility toward unionization coupled with knowledge of ongoing union activity, other unfair labor practices committed by the employer contemporaneous with the adverse action,

18

the timing of the adverse action in relation to union activity, the employer's reliance on pretextual reasons to justify the adverse action, disparate treatment of employees based on union affiliation, and an employer's deviation from past practice.

Id.  "We are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial."  Goya Foods of Fla., 525 F.3d at 1126 (quotation marks omitted).

First, citing its "long-lasting" and "cooperative" relationship with the Union, the company contends the Board relied "[e]xcessively on the [t]iming of the [d]ischarges" to discern discriminatory motive.  But "[t]he Board and [the] court[s] have long recognized that the close proximity of protected conduct, expressions of animus, and disciplinary action can support an inference of improper motivation." Inova Health Sys. v. NLRB, 795 F.3d 68, 82 (D.C. Cir. 2015); see also, e.g., Int'l Bhd. of Boilermakers v. NLRB, 127 F.3d 1300, 1307 (11th Cir. 1997) ("The timing of an employee's discharge may raise suspicions about a company's proffered motive.").  Thus, we see no error in the Board's reliance on the timing of the discharges.  The Board reasonably inferred that the decisions to discharge Mr. Acevedo—a Union supporter—and his jobsite partner only eight days before the election ballots were mailed support a finding of discriminatory motive.

Second, Advanced Masonry challenges the Board's reliance on threatened wage reductions.  As explained above, the Board's findings that Mr. McNett and

19

Mr. Feliz made statements threatening lower wages is supported by substantial evidence.

Third, Advanced Masonry says the Board erroneously found animus in Mr. Feliz's decision to call senior management before firing Mr. Acevedo and Mr. Stevenson. According to Advanced Masonry, it was Mr. Feliz's customary practice to first dole out provisional discipline then to revisit his decision after a review. Advanced Masonry contends Mr. Feliz contacted Mr. Karp as part of his review of Mr. Stevenson and Mr. Acevedo "in an abundance of caution" because of the "unique background of the impending union election."

Fatal to the company's argument, however, is that nothing in the record compelled the Board to infer Mr. Feliz made the phone call for good, rather than nefarious, reasons. This Court's deferential standard of review does not permit us to revisit plausible inferences. Instead, "[s]o long as the [Board] has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a de novo review of the evidence." Transit Connection, Inc. v. NLRB, 887 F.3d 1097, 1102 (11th Cir. 2018) (quotation marks omitted).

Mr. Feliz testified he did not "typically call" senior management to ask about appropriate discipline because he has been "given . . . the authority to dismiss whoever [he] thinks needs to [be] dismiss[ed]." He only did so here

20

because "there [we]re some dealings with the Union going on." He said given those dealings he "wanted to make sure that [firing Acevedo and Stevenson] was the right decision." Based on this evidence, the Board could reasonably infer that Mr. Feliz made the call, not out of an abundance of caution, but because Mr. Acevedo's union activities were motivating the discipline selected. Cf. NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 398, 404, 103 S. Ct. 2469, 2472, 2475–76 (1983) (finding the Board was justified in concluding an employee was fired because of his union activities where "the employer departed from its usual practice in dealing with rule infractions"), abrogated on other grounds by Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 276–78, 114 S. Ct. 2251, 2257–58 (1994).

Fourth, Advanced Masonry says the Board was wrong to credit testimony by Mr. Acevedo and Mr. Stevenson that other employees were not tied off correctly on May 16, 2016, yet were not disciplined. It is true that the evidence before the Board did not compel it to credit this testimony. But the record supports the Board's credibility determinations, and we see nothing "inherently unreasonable or self-contradictory" that would justify disturbing them. Goya Foods of Fla., 525 F.3d at 1126; see also Raymond Interior Sys., Inc., 812 F.3d at 178.

Fifth, Advanced Masonry challenges the Board's finding of disparate treatment. See Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 3.

21

The Board found that Advanced Masonry "warned and suspended several other employees for their first and second violations of the [fall-protection] policy." Id. In particular, the Board cited three instances in which employees were not fired for their first violations of the same policy Mr. Acevedo and Mr. Stevenson violated. Id. (describing incidents involving three other employees). The Board also explained how the two incidents in which employees were fired for their first violations of the fall-protection policy were not comparable to Mr. Stevenson's and Mr. Acevedo's situations. Id. This was because, unlike Mr. Stevenson and Mr. Acevedo, those two employees "engaged in severe compound safety violations." Id. (quotation marks omitted and alterations adopted). Advanced Masonry says these findings were not supported by substantial evidence and that the Board gave "short shrift" to evidence showing the company applied a zero-tolerance policy for witnessed fall-protection violations.

We conclude substantial evidence supports the Board's findings that Advanced Masonry treated Mr. Acevedo and Mr. Stevenson different from similarly situated employees who violated the same policy. Testimony before the ALJ adequately established that three employees who were similarly situated to Mr. Acevedo and Mr. Stevenson were not fired for their first violations of Advanced Masonry's fall-protection policy. For example, the record showed one employee received only a two-day suspension for his failure to use appropriate fall

22

protection while working at an elevation of more than six feet.  He later violated the very same rule and received a three-day suspension.  Advanced Masonry terminated him only after his third fall-protection violation.  The record also showed two other employees were only suspended—and not discharged—for their first fall-protection violations.

The record reveals the Board made no improper distinction between the two employees who had been fired for violating multiple Advanced Masonry policies. See id.  The distinctions it made arose reasonably from the record.  Although the Board might have concluded those employees were similar enough to Mr. Acevedo and Mr. Stevenson to warrant comparison, the record did not compel it to do so. Cf. Allied Med. Transport, Inc., 805 F.3d at 1008–09 (finding substantial evidence supported the Board's ruling that there had been disparate treatment despite the ALJ's and a dissenting Board member's contentions comparator employees were not similarly situated to employees against whom the company allegedly discriminated); NLRB v. Dynatron/Bondo Corp., 176 F.3d 1310, 1321 (11th Cir. 1999) (per curiam) (acknowledging evidence tending to show the Board's comparators were not similarly situated to an employee who received harsher treatment, but nonetheless concluding substantial evidence supported the Board's finding).  We therefore decline to disrupt the Board's findings.

23

Substantial evidence also supports the Board's finding that Advanced Masonry did not adhere to a zero-tolerance policy of firing employees for first fall-protection violations when those violations were observed by management, rather than general contractors.  See Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 4.  No one disputes Advanced Masonry labelled its policy as zero tolerance.  But the Board expressly found the "labeling . . . provides no defense" in light of evidence the company did "not in fact follow[] a zero tolerance fall-protection policy."  Id.  For example, the Board noted that even though one employee's first fall-protection violation was observed by the company's Safety Coordinator the employee was not terminated.[9]  Id.  And, notably, Advanced Masonry has pointed to no written policies establishing that fall-protection violations observed by company personnel are treated differently than violations observed by general contractors.

This Court has long recognized that "[a]lthough employers must be allowed to enforce their disciplinary rules, where an employer begins to enforce strictly a previously lax system of rules in retaliation for union activity or enforces rules selectively to discriminate against union supporters, . . . [we] will uphold a finding of unfair labor practices."  McClain of Ga., Inc., 138 F.3d at 1426.  Substantial

---

[9] Again, although Advanced Masonry says the Board should have concluded this employee was retained only because of an administrative mix up, the record did not compel that finding.

24

evidence supports the Board's finding that Advanced Masonry did not neutrally apply its written zero-tolerance policy. Instead, it applied the policy more strictly against a Union supporter and his jobsite partner.[10] Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 4.

Advanced Masonry also says the equal treatment of Mr. Acevedo (a Union member) and Mr. Stevenson (a nonmember) shows the company evenly applied its fall-protection policy. The Board found Mr. Stevenson was fired as "collateral damage." Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 2. The Board has previously recognized that an employee may be terminated "as part of an effort to camouflage the discriminatory discharge of a known union activist." Armcor Indus., Inc., 217 NLRB 358, 358 (1975). And this Court has similarly acknowledged that "discharges based upon purported disciplinary rules may violate the [NLRA] even if employees who oppose or are neutral toward the union are discharged along with union supporters." McClain of Ga., Inc., 138 F.3d at 1427. Substantial evidence, including the timing of the firings and differential treatment as compared to other employees, supports the Board's conclusion Mr. Stevenson was fired as collateral damage.

---

[10] This same evidence of disparate treatment and the close timing of the election, among other things, provides substantial support for the Board's finding that Advanced Masonry violated Sections 8(a)(1) and (3) of the NLRA by more strictly enforcing its fall-protection policy. Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 4–5. We therefore affirm that finding too.

25

To summarize, the Board did not improperly rely on, among other things, (1) the close timing of the election and the discharge decisions, (2) Advanced Masonry's nearly concurrent threats that wages would fall if employees selected the Union, and (3) disparate treatment of Acevedo and Stevenson as compared to other employees who violated the company's fall-protection policy in assessing whether the Union met its initial burden under the Wright Line framework. Substantial evidence supports the Board's finding that Mr. Acevedo's protected activity was a motivating factor for the discharges of Acevedo and Stevenson.

## 2.

The Board also found Advanced Masonry's stated reasons for the suspensions and discharges were pretextual and that the company failed to show it would have suspended Mr. Acevedo and Mr. Stevenson in the absence of Acevedo's Union activity. Advanced Masonry Assocs., LLC, 366 NLRB No. 57, slip op. at 4. Advanced Masonry says it met its burden of establishing it would have fired Mr. Acevedo and Mr. Stevenson for their fall-protection violations regardless of Acevedo's Union activities. It also says the Board erroneously concluded its proffered reason for firing Mr. Acevedo and Mr. Stevenson was pretextual.

As explained above, if the Board's General Counsel "shows that an employer's opposition to union activity was a motivating factor in the employer's

26

decision, an unfair labor practice is established unless the employer can prove as an affirmative defense, that it would have discharged the employee even in the absence of the protected activity." NLRB v. Malta Constr. Co., 806 F.2d 1009, 1012 (11th Cir. 1986). We have recognized that "in many cases there is evidence of both a lawful and an unlawful motive." Id. We have also said that "[w]hile management has a lot of freedom in hiring and firing its employees, it cannot fire when the real motive is to discriminate against pro-union employees." Id.; see also Chevron Mining, Inc. v. NLRB, 684 F.3d 1318, 1327 (D.C. Cir. 2012) ("The question under Wright Line is not just whether the employer's action also served some legitimate business purpose, but whether the legitimate business motive would have moved the employer to take the challenged action absent the protected conduct."). The pretext inquiry is fact bound, and the Board may rely on circumstantial evidence. See Malta Constr. Co., 806 F.2d at 1012. The critical question is not "whether the business reasons cited by the employer were good or bad, but whether they were honestly invoked and were, in fact, the cause of the [adverse action]." Ryder Distrib. Res., Inc., 311 NLRB 814, 816 (1993) (quotation marks omitted and alteration adopted).

Advanced Masonry relies largely on its written policies and its claims that the Board's credibility determinations and inferences were unreasonable. It also says the Board erred in finding it treated Mr. Acevedo and Mr. Stevenson

27

differently than similarly situated employees.  As we have explained, Board's factual findings on these points are supported by substantial evidence.

We likewise find substantial evidence supports the Board's ruling that Advanced Masonry's proffered explanation was pretextual and that the company would not have fired Mr. Acevedo and Mr. Stevenson absent Acevedo's Union activities.  The Board reached this conclusion by examining the treatment of other employees who violated the same safety rule as Mr. Acevedo and Mr. Stevenson. It also looked to evidence that the individual typically charged with making personnel decisions made an "unprecedented and suspicious decision to contact" senior management and testified that he did so because of concerns about the upcoming Union election.  Advanced Masonry Assocs., 366 NLRB No. 57, slip op. at 4.  Advanced Masonry's arguments that the Board's findings were faulty or insufficient fail.

## IV.

Substantial evidence supports the Board's findings that Advanced Masonry violated the NLRA by (1) threatening or implying that employees' wages would decrease if they voted to be represented by the Union and (2) discharging employees Luis Acevedo and Walter Stevenson because of Acevedo's Union activity.  Because Mr. Acevedo and Mr. Stevenson were not properly terminated

28

for cause and they meet the relevant eligibility criteria,[11] they were eligible to vote in the Union election.  See Steiny & Co., Inc., 308 NLRB 1323, 1326 (1992) (setting out the formula for voter eligibility in union elections for construction industry employers); see also Daniel Constr. Co., 133 NLRB 264, 266-67 (1961), as modified, 167 NLRB 1078 (1967).  We agree with the Board that the ballots cast by both men in favor of the Union should be tallied.  In light of Mr. Acevedo's and Mr. Stevenson's determinative votes in favor of the Union, we also conclude substantial evidence supported the Board's finding that Advanced Masonry violated Sections 8(a)(1) and (5) of the NLRA when it refused to bargain with its employees' chosen representative.  See Advanced Masonry Assocs., LLC, 366 NLRB No. 164 (Aug. 17, 2018); see 29 U.S.C. § 158(a)(1) (making it unlawful for a union employer "to interfere with, restrain, or coerce employees in the exercise of the[ir] rights guaranteed [by the NLRA]:"), id. § 158(a)(5) (making it unlawful for a union employer "to refuse to bargain collectively with the representatives of his employees.").

For these reasons, we **DENY** Advanced Masonry's petitions for review and **GRANT** the Board's cross-applications for enforcement of their April 13, 2018, and August 17, 2018, Decision and Orders.

---

[11]  Advanced Masonry does not dispute that Mr. Stevenson and Mr. Acevedo otherwise meet the applicable eligibility criteria.

29